Rebecca C. **MEIER**, As Chairperson and John C. Bailey, Michael L. Jordan, James R. Martin, Lt. Governor Frank O'Bannon, Patrick R. Ralston, Claude C. Reeck, Jr., Wayne T. Swallow and Roy J. Winkler, each as Members, of the Water Pollution Control Board of the State of Indiana, and Kathy L. Prosser, Commissioner of the Indiana Department of Environmental Management, Appellants–Defendants Below,

v.

**AMERICAN MAIZE–PRODUCTS COMPANY, INC.**, Bethlehem Steel Corporation, Commonwealth–Edison Company of Indiana, Inc., Fibre Form Corporation, Indiana–Kentucky Electric Corporation, Indiana Michigan Power Company, Landis & Gyr Metering, Inc., LTV Steel Company, Inc., National Steel Corporation, Phelps Dodge Magnet Wire Company, Southern Indiana Gas & Electric Company, Appellees–Plaintiffs Below.

No. 49A02–9304–CV–185.

Court of Appeals of Indiana, Second District.

Jan. 18, 1995.

664

Ronald E. Elberger, Keith E. White, George T. Patton, Jr., Bose McKinney & Evans, Indianapolis, for appellants.

Bryan G. Tabler, Peter J. Rusthoven, Barnes & Thornburg, Indianapolis, for appellees.

## OPINION

SULLIVAN, Judge.

Upon appeal from the trial court's grant of summary judgment against it, the Water Pollution Control Board (Board), a division of the Indiana Department of Environmental Management (IDEM), presents a host of issues for our review. We reorganize and restate the issues pertinent to this appeal as follows:

(1) Whether the Board acted within its delegated authority in establishing a National Pollutant Discharge Elimination System (NPDES) permit fee scheme, which conditioned the amount of a discharger's fee upon its status as a publicly or privately owned facility;

(2) Whether, in delegating authority to establish a rule setting the amounts of NPDES permit fees, the General Assembly provided the Board with sufficient standards by which to operate;

(3) Whether the Board violated I.C. 4–22–2–29(b) (Burns Code Ed.Repl.1990) by

adopting, in its Final Rule, NPDES permit fees which substantially differed from those contained in its proposed rule; and

(4) Whether the legislative delegation of authority offends the Indiana Constitution, Article 1, Sections 23 and 25.

We determine that the trial court incorrectly granted summary judgment in favor of plaintiffs, American Maize–Products Co., Inc., *et al,* (AMP), when it determined that the Board acted beyond its statutorily delegated authority, and that the statutes provided insufficient standards by which the Board might exercise authority to enact the fee schedule at issue. Questions of fact, relevant to the present determination of law here, as yet exist. We reverse and remand so that those remaining questions may be resolved.

The Board was established by IDEM in order to institute compliance with the federal Clean Water Act (CWA). In accordance with the CWA, every entity wishing to discharge effluents into the State's water must hold an NPDES permit.[1] The federal Environmental Protection Agency (EPA) allowed Indiana the authority to issue such NPDES permits.

Subsequently, the Board was granted power, by the General Assembly, to issue the NPDES permits under I.C. 13–7–2–15(a) (Burns Code Ed.Repl.1990). I.C. 13–7–10–1(d) (Burns Code Ed.Repl.1990) allows the Board to establish requirements for the issuance of NPDES permits. The Board was also given power, in I.C. 13–7–16–6 (Burns Code Ed.Repl.1990) (hereinafter, the Fee Statute), to establish rules setting fees for issuance of these NPDES permits.[2]

---

1. These NPDES permit holders will hereinafter be referred to as "dischargers."

2. The portion of I.C. 13–7–16–6 (the Fee Statute) relevant for our present purposes reads:

 "(a) A board establishing fees or changing the amount of a fee shall proceed as in the case of adoption of rules and shall take into account:
 (1) The cost of the issuance of a permit or license;
 (2) The cost of the performance of services in connection with the supervision, review, and other necessary activities related to the area involved;

 (3) The cost of the surveillance of the activity or property covered by the license or permit; and
 (4) Fees charged for equivalent permits or licenses in other states.
 (b) A fee established by one (1) of the boards under this section for a type or class of permit may be based on the average of the costs specified in subsection (a) for all permits of that type or class.

 . . . . ."

Pursuant to these statutes, the Board sought to enact a rule establishing fees relating to applications for permits and for the permits themselves. However, the rule enacted by the Board not only established a permit application fee, but also set a fee schedule for NPDES permits which distinguished among classes of dischargers based upon their status as state, federal, municipal, or privately-owned entities. The relevant portions of the rule adopted by the Board, in its final form, is codified at Ind.Admin.Code tit. 327, r. 5–2–21 (1991). It reads:

"5–2–21 Fees

. . . . .

Sec. 21. (a) The following governmental entities shall be excluded from payment of fee as described in subsection (b):

(1) County, municipality or township which is defined as a unit. . . .

(2) A nonprofit organization.

(3) A conservancy district.

(4) A school corporation that operates a sewage treatment facility.

(5) A regional water or sewage district.

(b) The following fees are established, pursuant to I.C. 13–7–16–6, to defray the costs of processing permit applications and administering the NPDES permit program from applicants other than governmental entities as described in subsection (a):

(1) An initial application fee of fifty dollars ($50) shall be remitted upon the filing of an NPDES permit application.

(2) A fee of fifty dollars ($50) shall be assessed for the processing of a request from the permittee to modify the permit . . .

(3) An annual fee schedule as follows:

| TYPE OF NPDES FACILITY: | ANNUAL FEE [*] |
| --- | --- |
| Semipublic, state and federal | . . . . |
| Industrial and public water supply | . . . . |
| Exclusion for industrial facility: | |
| coal mine, stone quarry, and | . . . . |
| storm water run-off | . . . . |

[*] Maximum annual fee of eighty thousand dollars ($80,000) per permit per year . . ." [3]

AMP brought suit against the Board seeking declaratory judgment to the effect that, although the Board could set NPDES permit fees, the differentiated scheme it had adopted was invalid. AMP also sought a permanent injunction to prohibit the Board from future collection of the permit fees.

AMP and the Board each filed cross-motions for summary judgment. Each party asked that the trial court decide whether the Board had the authority to enact the differentiated NPDES fee schedule. The court granted AMP's motion for summary judgment, holding the Final Rule invalid and unenforceable because the Board had exceeded its authority. The court also granted AMP's request for permanent injunction: the Board was prohibited from collecting NPDES permit fees as assessed through the use of the Final Rule.

### I. *The Board's Authority*

■ In determining whether the Board acted within its delegated authority, this court must keep in mind the standard of review under which we operate. As the is-

sues involved in the present appeal are solely questions of law, rather than questions of fact, the agency's interpretation of that law is entitled to no deference; instead, this court may determine any question of law arising from an agency's determinations. *Hamilton County Dept. of Public Welfare v. Smith* (1991) 5th Dist. Ind.App., 567 N.E.2d 165, 168; *Indiana Dept. of Environmental Management v. AMAX* (1988) 1st Dist.Ind.App., 529 N.E.2d 1209, 1214.

■ In the present case, the trial court found the Final Rule unconstitutional because the Board had exceeded its statutory authority. While the Comprehensive Statement of Issues and Undisputed Facts, Conclusions of Law, Judgment and Order are extremely helpful to us as the reviewing court, the stated rationales for the judgments are not conclusive of the matters of law at issue. Rather, when reviewing the propriety of the summary judgment ruling, we apply the same standard applicable to the trial court. *Rosi v. Business Furniture Corp.* (1992) 5th Dist. Ind.App., 601 N.E.2d 408.

---

**3.** For the sake of clarity, this formulation will be referred to as the Final Rule. The previous draft of this rule will be referred to as the Proposed Rule.

Thus, if we find that the Board's actions are in any way beyond its delegated authority, the trial court's decision will be affirmed. It is the province of the party appealing from the grant of summary judgment to persuade this court "that the trial court erroneously determined that there is no material issue of fact and that the movant was entitled to summary judgment as a matter of law." *See Indiana Board of Public Welfare v. Tioga Pines Living Center, Inc.,* (1993) Ind., 622 N.E.2d 935, 940.

▋ Whether the trial court's determination may be affirmed therefore depends upon those powers which the legislature granted the Board. "When regulatory powers have been granted and exercised, we may enforce the rules and regulations only as long as they are within the scope of the statute." *Indiana Dept. of State Revenue v. Best Ever Companies* (1986) 2d Dist. Ind.App., 495 N.E.2d 785, 787. In exercising regulatory powers to effectuate the purposes of the law, a board may not make rules or regulations which are inconsistent with the purposes of the statute. *Potts v. Review Bd. of Indiana Employment Security Div.* (1982) 4th Dist. Ind.App., 438 N.E.2d 1012, 1015–16. Neither may a board add to or detract from the law it enforces, nor may it expand its powers beyond those delegated. *Best Ever, supra* at 787. Here, it is undisputed that the legislature, in the Board's authorizing statutes, explicitly granted it authority to issue NPDES discharge permits, and to charge a fee for the issuance of those permits.[4] The issue, then, remains: whether the legislature, in relevant statutes, has vested the Board with authority to classify dischargers based upon ownership, charging some classes more than others for their NPDES permits.[5]

Although AMP does not challenge the Board's authority to set NPDES fees, per se, it does challenge the manner in which the Board has done so. Upon appeal, AMP claims that the Board exceeded the authority delegated to it by the legislature when it enacted the "discriminatory" permit fee scheme. It contends that no such "scheme," differentiating public from private dischargers, was authorized or contemplated by the General Assembly when it enacted the Fee Statute. Neither, it contends, does any other statute cited by the Board confer upon it the authority to enact the fee setting scheme. Thus, AMP concludes that the Board acted in excess of its authority when it classified the dischargers based upon their ownership, i.e., publicly-owned versus privately-owned.

The Board's position is that it in no way exceeded its delegated authority; indeed, in promulgating the Final Rule, it alleges that it acted squarely within those powers conferred upon it by Indiana's legislature. The Board cites the Fee Statute, I.C. 13–7–10–1(b)(2) (Burns Code Ed.Repl.1990), and I.C. 13–7–7–2 (Burns Code Ed.Repl.1990). It contends these statutes confer upon it both the explicit and the implicit authority to differentiate among classes of dischargers when determining fees for NPDES permits.

▋ The key factor in determining whether the Board has been granted the authority to differentiate among classes of dischargers is the specificity of the statutory language. *Board of School Trustees of the Worthington–Jefferson Consolidated School Corp. v. Indiana Education Employment Relations Bd.* (1978) 1st Dist., 176 Ind.App. 354, 380 N.E.2d 93, 95. Accordingly, an examination of those statutes the Board cites as controlling is of the utmost importance. This court must make an independent assessment of the statute's meaning; we are not required to grant deference to the trial court's interpretation. *Foursquare Tabernacle Church of God in Christ v. Dept. of Metropolitan Development of the Consolidated City of Indianapolis* (1994) 2d Dist. Ind.App., 630 N.E.2d 1381, 1387, *trans. denied.*

Of those statutes cited by the Board, I.C. 13–7–7–2 is dispositive of this issue. As aforementioned, there is no debate that the

---

4. I.C. 13–7–7–5(2) (Burns Code Ed.Repl.1990) provides that the Board may prescribe procedures for the administration of a system of permits for the discharge of contaminants.

5. It should also be noted that the permit fee scheme exempts some classes of dischargers, most notably, municipal dischargers, from paying any fee for NPDES permits. This exemption will be addressed *infra.*

Board possesses statutory authority to issue NPDES permits and to set permit fees. Additionally, in reading I.C. 13–7–7–2, we conclude that the legislative grant of power also confers upon the Board the power to differentiate among classes of dischargers in setting a schedule of permit fees.

I.C. 13–7–7–2 reads:

"(a) Any rule or standard adopted by a board may:

(1) Make different provisions as required by varying circumstances and conditions for different contaminant sources and for different geographical areas;

(2) Be made applicable to sources outside this state causing, contributing to, or which could cause or contribute to environmental pollution in this state; and

(3) Make provision for abatement standards and procedures respecting occurrences, emergencies, or pollution or on other short-term conditions constituting an acute danger to health or to the environment.

(b) In adopting rules and establishing standards, a board shall take into account:

(1) All existing physical conditions and the character of the area affected;

(2) Past, present, and probable future uses of the area, including the character of the uses of surrounding areas;

(3) Zoning classifications;

(4) The nature of the existing air quality or existing water quality, as the case may be;

(5) Technical feasibility, including the quality conditions that could reasonably be achieved through coordinated control of all factors affecting the quality; and

(6) Economic reasonableness of measuring or reducing any particular type of pollution...."

The Board relies upon the plain meaning of I.C. 13–7–7–2. It argues that this statute allows it the authority to "make different provisions" for classes of dischargers who are "different contaminant sources." It cites fee setting as a perfect example of a provision for which this statute confers authority to differentiate.

We agree with the Board's interpretation of the statute. Relying upon the well-established principles of statutory construction, we first look to the plain language of the statute, imparting to it its ordinary and common usage. "When a statute is clear and unambiguous on its face, this court may not interpret the statute." *Scheub v. Town of Schererville* (1993) 5th Dist. Ind.App., 617 N.E.2d 585, 587, *reh'g denied.* The court "must examine the [statute] as a whole and, if possible, give effect to every word and clause therein." *Scheub, supra.*

Indeed, the language of I.C. 13–7–7–2 seems not only to authorize differentiation by the Board, but to contemplate it. The portion of the statute which is most persuasive in this respect reads:

"Any rule or standard adopted by a board may:

(1) make different provisions as required by varying circumstances and conditions for different contaminant sources and for different geographical areas...."

In the context of general environmental legislation, it is axiomatic that "different contaminant sources" may only logically refer to different types of pollutant sources which discharge "any solid, semisolid, liquid, or gaseous matter, or any odor, radioactive material, pollutant ..., hazardous waste ..., any constituent of a hazardous waste, or any combination thereof...." I.C. 13–7–1–7 (Burns Code Ed.Repl.1990) (defining a "contaminant"). Were dischargers who sought NPDES permits not considered "different contaminant sources," as per the statute, the Board could never fulfill its stated purposes, to wit: controlling water pollution and atomic radiation by limiting the discharge of contaminants. I.C. 13–7–10–1(d) and I.C. 13–7–10–1(d)(1).

Further, we see no reason that the definition of "provision" should not include rules encompassing NPDES fees. The authority granted to the Board must include within it the prerogative to determine differing NPDES fees based upon differing circumstances of those permit applicants. In the

case at bar, the differing circumstances which required different provisions are set forth in the Fee Statute: the costs of surveillance and enforcement of effluent limitations contained in the NPDES permits.

■ As logical as the plain meaning of the statute might seem, it is axiomatic that an individual statute may not be construed in isolation. *Smith v. State ex rel. Medical Licensing Board* (1984) 2d Dist. Ind.App., 459 N.E.2d 401, 404. Instead, various provisions of a statute must be construed so as to impart consistent interpretations in the context of an act as a whole, in order that the intent of the legislature is carried out. *Park 100 Development Co. v. Indiana Dept. of State Revenue* (1981) Ind., 429 N.E.2d 220, 222–223; *see also Mogilner v. Metropolitan Planning Commission of Marion County* (1957) 140 N.E.2d 220, 236 Ind. 298 (an interpretation of a statute should be adopted whereby a statutory section remains consistent with other sections, rather than an interpretation which results in the statute's invalidity). Indeed, several other statutes are illuminating: I.C. 13–7–7–5(2) allows boards to provide for a system of NPDES permits; I.C. 13–7–16–6 refers to costs for permits of a "type or class"; and I.C. 13–7–10–1(b) allows a board to prescribe standards for the discharge of contaminants and to impose conditions to accomplish the chapter's purposes.

Although they do not specifically address the present issue, when these additional statutes are logically read together with I.C. 13–7–7–2, they not only allow, but actually invite, the Board to develop a system for NPDES permit fees which involves the classification of dischargers. *See Potts, supra,* 438 N.E.2d at 1015 (reading statutes together to ascertain whether board had the authority to determine how to allocate wage credits).

We deem it appropriate, if not necessary, to our resolution of the issue, to refute AMP's interpretation of I.C. 13–7–7–2. AMP

construes I.C. 13–7–7–2 as nothing more than a general provision relating to "substantive" environmental rulemaking. It urges that the language of the statute was not meant to apply to a "procedural" rule such as the Final Rule at issue here.[6] As this is the case, AMP argues, the statute imparts no support for the Board's authority to set up the fee scheme, which essentially consists of procedural classifications among dischargers. Therefore, the Board's reliance upon I.C. 13–7–7–2 as authority to classify dischargers is a doubtful claim to administrative power, and should be resolved against the Board.

We cannot, in good faith, countenance AMP's proffered construction of I.C. 13–7–7–2. Indeed, the language of I.C. 13–7–7–2 indicates precisely the opposite of the trial court's conclusions: the statute pronounces that it applies to "any rule" adopted by the Board. As such, we find no reason to limit its application to "procedural" rules, as did the trial court.[7] The statute manifests no intent to distinguish its application based upon a type of rule which may only exist in the abstract, and we can find no rationale in Indiana law which allows us to do so. It is this court's duty to give effect to the legislature's intent;[8] therefore, we will not inflict upon the statute an additional restriction which is not present in its language, and which the legislature did not itself see fit to impose.

In establishing different categories of dischargers, the Board honored the mandates of I.C. 13–7–7–2. The statute declares that the Board may make different provisions, and, in doing so, should consider varying circumstances. This indicates more than a mere suggestion; indeed, it is a legislative directive that the Board at least examine differing consequences based upon divergent discharge sources and the sources' circumstances, though it possesses discretion to act upon those observations in making differing provisions. Were the Board not empowered

6. We note that neither AMP nor the trial court cite authority for this interpretation of the statute.

7. We also note that the distinction between those rules labelled "substantive" and those labelled "procedural" is somewhat unclear in the present context, and any distinction is also infinitely sub-

ject to manipulation. Neither the trial court nor AMP attempt to define these terms.

8. *See Marion County Dept. of Public Welfare v. Methodist Hosp. of Indiana, Inc.* (1982) 2d Dist. Ind.App., 436 N.E.2d 123, 125.

to act upon its observations in setting NPDES fees, as it did in the present case, the statute would be rendered illogical. Therefore, we conclude that I.C. 13–7–7–2 empowers a board to make varying provisions as required by different circumstances, and, therefore, encompasses the Board's actions here.

▮ Whether or not the clearly appropriate ability of the Board to charge different permit fees for different dischargers carries with it the authority to totally exempt some sources, while charging some more and others less, presents a corollary question. Here, the Board altogether exempted certain publicly-owned facilities from paying fees for NPDES permits.

It is a longstanding principle of modern society that state-owned facilities differ from privately-owned facilities:

"The private corporation, whatever its public duties, is organized for private ends and may be presumed to intend to make whatever profit the business will allow. The municipal corporation is allowed to go into the business only on the theory that thereby the public welfare will be subserved. So far as gain is an object, it is a gain to a public body and must be used for public ends. Those who manage the work cannot lawfully make private profit their aim, as the plaintiff's directors not only may but must." *Springfield Gas and Electric Co. v. Springfield* (1921) 257 U.S. 66, 70, 42 S.Ct. 24, 25, 66 L.Ed. 131.

In the context of water pollution control, it seems the public/private distinction is rational because of the relative ease with which public dischargers, and their records, may be accessed by a similar state agency; it seems a most basic concept that necessary surveillance of private dischargers requires additional resources. That the Board distinguished sources upon the bases of ownership, i.e., public or private, is a rational decision

which was not unreasonable based upon the differing concerns associated with the different contaminant sources. Consequently, we find that the Board's authority to entirely exempt some dischargers is inherently encompassed within the confines of I.C. 13–7–7–2's authorization to establish a classification system.[9]

Accordingly, the Board must also possess the inherent authority to impose higher NPDES fees for some dischargers, while at the same time imposing lower fees upon others. Our modern society is a highly complex one. It has developed hundreds of different products and industries to meet the needs and wants of the populous. It would be impracticable, and perhaps impossible, for the Board to treat hundreds of different dischargers, no doubt from divergent industries and discharging hundreds of different chemical contaminants in a myriad of different combinations, identically. Therefore, an NPDES classification schedule, grouping industries separately, may be the only rational solution. In setting up a classification scheme based upon the differences among these dischargers, the Board followed the mandates of I.C. 13–7–7–2 precisely.

Thus, the Board has demonstrated that the trial court erred in its determination to the contrary. In light of our conclusion, it is unnecessary that we address the Board's contention that the legislature acquiesced in the NPDES fee scheme through its failure to override that scheme.[10]

### II. *Sufficiency of Standards*

▮ AMP next challenges the "unconstitutional delegation" of legislative rulemaking authority to the Board. It argues that the Fee Statute, even combined with other statutes, provided insufficient standards by which the Board could act to set the proper amount for NPDES fees. Conversely, the Board argues that, not only does the Fee

---

9. In so holding, we emphasize that any such exemption must be granted by resort to reasonable and rational analysis of the circumstances. They may not be arbitrarily granted or withheld.

10. The Board argues that even where no explicit delegation to enact the fee scheme exists, implicit authority to adopt the differentiated system may

be imputed from the General Assembly's "acquiescence" to the Board's adoption of the fee scheme. In essence, the Board argues that because the legislature failed to override its actions by mandating a different fee scheme, or by itself changing the Fee Statute, it implicitly approved of the Board's actions.

Statute give it authority to differentiate, but it also enumerates guidelines of a very specific nature. The direction given the Board to consider NPDES fees charged by other states, it argues, amounted to a specific legislative mandate to instigate a similar fee program, although still within those boundaries.

The trial court agreed with AMP's argument. The court stated its conclusions upon this issue thusly:

> "[N]either the Fee Statute ... nor any other environmental statute cited by Defendants 'declares a legislative policy' authorizing the fee discrimination between Targeted and Exempted Dischargers adopted by the Board in the [Final] Rule.... The statutes 'establish[ ] no criterion to govern the Board's course' in deciding if, how much, and in whose favor to discriminate.... If divorced from the substantive environmental factors specified in [I.C. 13–7–7–2(a)(1) ] and applied (as Defendants urge) to fee setting, this provision would give the Board 'blank check' fee-discrimination power...." Record at 746.

After careful examination of the Fee Statute, we cannot agree that the Board has insufficient criteria upon which to determine the amounts of dischargers' NPDES fees.

Initially, the Board contended that the genesis of its authority to differentiate among classes of dischargers was the Fee Statute itself. However, it is clear that the Fee Statute does not, of itself, confer the authority to differentiate; instead, it seems that the Fee Statute was intended to set forth factors for the Board's use in determining the proper amount of NPDES fees. In this respect, the Fee Statute adequately accomplishes its purposes—that of providing standards for the Board—while not mandating a particular outcome, or impinging upon the obligatory discretion of the Board. *See Stanton v. Smith* (1981) Ind., 429 N.E.2d 224, 225 (because of its expertise, board was the most proper body to "set the actual figure of ratable reduction" in financial standards for determining the needs of welfare benefit recipients).

The law is well-settled that "the legislature may constitutionally delegate rule-making powers to an administrative agency if that delegation is accompanied by sufficient standards to guide the agency in the exercise of its statutory authority." *Barco Beverage Corp. v. Alcoholic Beverage Commission* (1992) Ind., 595 N.E.2d 250, 253–54. However, the legislature, in providing an administrative agency with such standards for the exercise of its rule-making powers, need not be precise, but may instead confer some amount of discretion upon the agency: " 'The standards, however, [need only be as] specific as the circumstances permit, considering the purpose to be accomplished by the statute.' " *Id.* at 254 (quoting *Taxpayer's Lobby of Indiana, Inc. v. Orr* (1974) 262 Ind. 92, 311 N.E.2d 814, 819).

In *Steup v. Indiana Housing Finance Authority* (1980) 273 Ind. 72, 402 N.E.2d 1215, 1228, our Supreme Court further elaborated upon the degree of specificity required of standards in a legislative delegation:

> " '[T]he policy of the Legislature and the standards to guide the administrative agency may be laid down in very broad and general terms. Such terms get precision from the knowledge and experience of the [persons] whose duty it is to administer the statutes, and then such statutes become reasonably certain guides in carrying out the will and intent of the Legislature.' " (citations omitted).

The *Steup* court found sufficient standards existed because the General Assembly had provided the necessary definitions of vague terms, such as " 'low and moderate income families' ". 402 N.E.2d at 1228. It also refused to find other "broad and general" terms invalid, because those terms "involve[d] methods and details that are well placed in the [board's] discretion." *Id.* In order to determine whether the delegation here at issue, I.C. 13–7–7–2, is a constitutional one, it is important that this court examine the act to determine if standards, by which the Board must abide, exist.

In so doing, we must also keep in mind the elementary principle that, if possible, every doubt must be resolved in favor of the delegating statute's validity. *Steup, su-*

*pra,* 402 N.E.2d at 1217. This idea is not a new one; in the past, our Supreme Court has held that a statute, by which the legislature delegated to a board the function of allocating a utility service area, is to be construed so as to bring the statute within constitutional limits. *See General Telephone Co. v. Public Service Commission* (1958) 238 Ind. 646, 150 N.E.2d 891, *reh'g denied.*

Notwithstanding that there may not be extensive criteria by which to determine the costs of NPDES permit fees, nevertheless guidelines do exist for the Board to determine "whether, or in what amounts, or to whose benefit or detriment" fees should be adopted. Record at 746.[11] In the Fee Statute, the legislature set out broad guidelines for the Board to consider in setting fees. In so doing, the General Assembly was not required to provide very specific guidelines, but only those as specific as the circumstances permitted. Indeed, the discretion the General Assembly left in the Board's hands was the ability to consider relevant factors which bear upon an appropriate actual dollar amount for NPDES permits. We cannot find the lack of an intelligent guiding principle; as such, no serious issue is raised as to the constitutionality of the delegation.

The trial court assumed, in addressing this issue, that there were no standards provided for the Board by which to establish a "discriminatory" fee scheme and that therefore any construction permitting such "discriminatory" scheme would offend Indiana's constitution. It is clear that the trial court is validly concerned that the Board might set any dollar amounts it wishes, upon any class of dischargers, and for any reason it deems appropriate. That concern is apparently heightened by the prospect that the Board may establish fees for some users while exempting others.

In the present case, the trial court's concerns are lessened by the judicially-imposed requirement that the rules and regulations adopted by the Board be "'designed to enable [an agency] to perform its duties and to effectuate the purposes of the law under which it operates....'" *Best Ever, supra,* 495 N.E.2d at 787. Here, the Board was required to take into account those factors enumerated in the Fee Statute in fulfilling its statutory duty, that of issuing NPDES permits to ultimately control Indiana's water pollution.[12] *See Indiana Environmental Management Bd. v. Indiana–Kentucky Electric Corp.* (1979) 2d Dist., 181 Ind.App. 570, 393 N.E.2d 213, 219.

We cannot ignore, though, that all revolve around the costs of surveillance, supervision of dischargers and actual issuance of NPDES effluent discharge permits, to wit:

(1) The cost of the issuance of a permit or license;

(2) The cost of the performance of services in connection with the supervision, review and other necessary activities related to the area involved;

(3) The cost of the surveillance of the activity or property covered by the license or permit; and

(4) Fees charged for equivalent permits or licenses in other states.

The only reasonable interpretation of the Fee Statute is one which allows the Board the ability to set reasonable fees to recoup the costs it expends in instigating and maintaining the NPDES scheme, and nothing more. Nowhere do we find manifested a legislative intent that those fees serve as a revenue-producing device for the State of Indiana. That the Board is required to take into account those cost-related factors in assessing the amount of NPDES fees therefore serves as an important guiding principal for the Board, and a check upon its power. It alleviates the danger of agency power running amok.

Furthermore, the Board itself seems to have recognized the cost-related limitations imposed upon it by the Fee Statute. Indeed, Ind.Admin.Code tit. 327, r. 5–2–21(b) (1991) declares that the NPDES fees are established to "defray the costs of processing permit applications and administering the permit application program from applicants other than governmental entities...." Thus,

---

11. For a list of the factors the General Assembly required that the Board consider, see *supra* n. 2.

12. *See supra* n. 9.

the language of the challenged rule itself lends credence to our interpretation of the Fee Statute as a device which allows the Board, in setting NPDES permit fees, only to recoup the costs it has expended.

We realize that there is a seeming weakness in our interpretation of the Fee Statute as one designed solely for cost recoupment. That the legislature, in I.C. 13–7–13–2 (Burns Code Ed.Repl.1990),[13] has established an environmental management special fund seems to present a general challenge to the notion that the Fee Statute was intended only to recoup IDEM's costs. The special fund provides that a portion of the funds collected pursuant to the Fee Statute be designated for emergency purposes, and that expenses of the Indiana hazardous waste facility site approval authority be paid from the fund. These references could lead to the superficial view that the Fee Statute is, in effect, designed to be a calculated surplusage for those enumerated purposes.

We cannot impute more than cost-recoupment to the Fee Statute unless its language allows; yet, arguably, the special fund provision would not exist without some mechanism for funding. Our interpretation of the Fee Statute combined with the existence of the special fund presents a seeming inconsistency which is within the legislature's province to correct. Indeed, that we interpret the Fee Statute to allow only cost-recoupment does not mean that other environmental statutes, cited as additional sources for the special fund,[14] might be similarly restricted. Such other statutes might well be construed to permit more than mere cost-recoupment. However, we will not invade the legislature's province by addressing any perceived inconsistency.

As we have determined that the Fee Statute was intended to establish cost-recoupment guidelines for the Board's use in setting NPDES fees, we cannot countenance the Board's argument that I.C. 13–7–16–6(a)(4), the disputed Other States' Fees clause, is one which imparts to it the additional authority to differentiate among dischargers. Instead, the Other States' Fees clause must itself be a guideline for the Board's use in setting NPDES fees which will allow it to recoup its costs. However, because the Board places so much emphasis upon the Other States' Fees clause, it is necessary that we determine how the Board was intended to use this most ambiguous of the Fee Statute's factors.

As we must read every portion of a statute so as to give a consistent meaning to the whole, see Scheub, supra, 617 N.E.2d at 587, the Other States' Fees clause must be interpreted harmoniously with the Fee Statute's reference to a "type or class" of permit. That portion of the statute reads:

"(b) A fee established by one (1) of the boards under this section for a type or class of permit may be based on the average of the costs specified in subsection (a) for all permits of that type or class."

Initially, it is elementary that the language of subsection (b) of the Fee Statute requires this court to focus upon one single Board among all the boards established by the legislature in the area of environmental controls. Its reference to a "type or class" of permits, however, is not as clear. We divine the meaning of these terms by looking to

13. I.C. 13–7–13–2 reads:
"(a) Money collected under section 1 [I.C. 13–7–13–1] of this chapter, fees collected under IC 13–7–16–6, fees collected under IC 13–7–8.5–7(f), and fees collected under IC 13–7–8.6–4(e) shall be remitted by the officials collecting the money or fees to the treasurer of state and credited to the environmental management special fund. The money on deposit in the environmental management special fund shall be used exclusively for the purposes of the department and the boards. The revenues accruing to the fund are appropriated to the department for purposes of this article. However, expenditures for projects authorized by the department or a board must be approved by the governor and the budget agency. Expenses of the Indiana hazardous waste facility site approval authority under IC 13–7–8.6 shall be paid from the fund with the approval of the governor and the budget agency. (b) A certain amount of the fund shall be set aside by the budget agency with the governor's approval to be expended for emergency purposes under IC 13–7–12–3 by the commissioner, without additional approval from the budget agency or the governor."

14. Those statutes are I.C. 13–7–13–1 (Burns Code Ed.Repl.1990), I.C. 13–7–8.5–7(f) (Burns Code Ed.Repl.1990), and I.C. 13–7–8.6–4(e) (Burns Code Ed.Repl.1990).

other sections of Chapter 13 (Burns Code Ed.Repl.1990).[15] Indeed, by virtue of that chapter, the Board issues at least five types of permits: wastewater management permits, I.C. 13–7–8.8–5; permits to control discharge of contaminants, I.C. 13–7–10–1(d)(1); permits for construction, modification, or installation of facilities, equipment, or devices for pollution control, I.C. 13–7–10–1(d)(2); permits for the operation of facilities for the discharge of contaminants, I.C. 13–7–10–1(d)(3); permits for the construction, installation or modification of facilities, equipment, or devices for any public water supply, I.C. 13–7–14–5(a)(1); and permits for the operation of facilities, equipment, or devices for any public water supply, I.C. 13–7–14–5(a)(2).

The legislative mandate of the Other States' Fees clause then, is that, when the Board assesses permit fees, it must consider other states' permit fees in the context of comparable types of permit fees. In comparing fees, the Board must be wary of several things. Of course, the Board must remain conscious of the fact that there are different types of permits; it must make comparisons on par with those types. In essence, the Board must compare apples to apples, rather than to oranges. Additionally, as we have determined that Indiana's Fee Statute is concerned solely with cost-recoupment, the Board must be mindful that it compares only those states' fee systems which have in mind a similar goal. Any comparisons outside the boundaries of this approach would defeat the purpose of the Fee Statute as a whole.

■ We conclude that, though the Board was authorized to establish a differentiated fee scheme, summary judgment in favor of the Board would have been inappropriately rendered. The Fee Statute allows the Board only to recoup its costs; thus, the question remains as to whether the monetary amounts the Board set in its existing fee scheme are, in fact, logically tied to the recoupment of its costs. This must be a question of fact for the trial court's determination.

### III. *Constitutional Questions*

AMP contends that the differentiated NPDES fee scheme, should it stand, violates the Indiana Constitution, Article I, Sections 23 and 25, as a matter of law. It argues that no question of material fact exists but that differentiation among classes of dischargers impermissibly confers privileges and immunities upon one class of persons, i.e., state-owned facilities, in violation of Section 23. It claims that the Other States' Fees clause violates Section 25 because it makes Indiana's NPDES fees "depend" upon the laws of other states.

The Board professes that the NPDES permit scheme presents no serious constitutional questions, as AMP contends, but is indeed valid and enforceable as it stands. The Board argues that the fee scheme's differentiation among dischargers raises no serious issue under the Privileges and Immunities Clause of the Indiana Constitution, Article I, Section 23, because the scheme does not involve either fundamental rights or a suspect class. Neither is a serious issue raised under Section 25, because the fee scheme does not mandate reliance upon the actions of other states in order to be effective, but simply directs the Board to "take into account" other states' fees prior to enacting its own NPDES fees.

■ We agree with the Board that the Fee Statute, and the NPDES fee schedule itself, present no serious constitutional questions. From the language employed by the legislature, and as we have previously discussed, it is clear that the Fee Statute does not command reliance upon any other state's fee scheme in contravention of Article I, Section 25.

■ That the Board's classification may impermissibly confer privileges and immunities upon some dischargers, however, is not as easily ascertained from the language of the Fee Statute. Here, the language of the Fee Statute is of little consequence; AMP challenges the classification in the Final Rule itself—and ultimately the rationale underlying the Board's actions—as an irrational one.

The widely-cited test upon which this court premises its analysis is stated by the Indiana Supreme Court:

**15.** This volume cite also includes the following citations.

"In order for this classification to satisfy the guarantee of equal protection, it 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' . . . The standard to be applied in protecting rights secured by Art. I, § 23, of the Indiana Constitution, is whether the legislative classification is based upon substantial distinctions with reference to the subject-matter, or is manifestly unjust or unreasonable. *"Johnson v. St. Vincent Hospital, Inc.* (1980) 273 Ind. 374, 404 N.E.2d 585, 597 (citations omitted).[16]

*See also Lafferty v. Review Board of the Indiana Dept. of Employment and Training Services* (1992) 2d Dist. Ind.App., 600 N.E.2d 1378, 1382, *trans. denied* (the General Assembly's classification "is to be upheld if it is rationally related to furthering a legitimate state interest."). Thus, a classification such as this one, which is not based upon fundamentally suspect characteristics, will not, per se, violate the privileges and immunities clause if it is based upon " 'substantial distinctions which make one class so different from another as to suggest the necessity for different legislation with respect thereto.' " *Steup, supra,* 402 N.E.2d at 1222–23.

Citing *Indiana & Michigan Electric Company v. City of Anderson* (1978) 2d Dist., 176 Ind.App. 410, 376 N.E.2d 114, 119–20, the Board asserts that the different character and goals of the regulated entities is a rational basis upon which to base the public/private distinction. Conversely, AMP claims that the Board irrationally classified dischargers because all NPDES permits issued by it are of the same "type or class." As earlier discussed, with relation to the Other States' Fees clause, we noted that not all permits are of the same type or class. We have previously determined that the Board's classification among dischargers who are differently circumstanced is a rational distinction which was authorized by the Fee Statute. We have no qualms in finding that the Board's distinctions between public and private entities are substantial ones which are related to the Board's purposes: controlling water pollution. *See* I.C. 13–7–10–1(d). Indeed, "equal protection [of the laws] does not guarantee similar treatment to those not similarly situated." *City of Indianapolis v. Hargis* (1992) Ind., 588 N.E.2d 496, 500. We conclude that the Board's classification scheme does not unreasonably confer privileges and immunities upon any single group of dischargers.

### IV. Substantial Difference in the Final Rule

 In its summary judgment disposition, the trial court determined that the Board had failed to follow the proper procedures in enacting the Final Rule. It concluded that the Final Rule's differentiated scheme violated the mandates of I.C. 4–22–2–29(b) (Burns Code Ed.Repl.1990) (hereinafter, "older version") because it was a "far different approach to funding" than the " 'everyone pays' " approach taken by the Proposed Rule. Record at 759. Upon appeal, the Board contends not only that the trial court's conclusion was in error, but that it wrongly applied the older version of the statute. Thus, we must first determine which version of the statute should apply to the present challenge.

The resolution of this issue is important because, while the older version of subsection (b) [17] only prohibits the Final Rule and the Proposed Rule from differing substantially, the new version [18] of I.C. 4–22–2–29(b)

---

16. This analysis is consistently used in an administrative context. *See Sturrup v. Mahan* (1974) 261 Ind. 463, 305 N.E.2d 877, 879 (showing of reasonableness sufficient to sustain legislative or administrative classification); *see also Indiana & Michigan Electric Co. v. City of Anderson* (1978) 2d Dist., 176 Ind.App. 410, 376 N.E.2d 114, 119–20; *Steup, supra,* 402 N.E.2d at 1223; *Lafferty, supra,* 600 N.E.2d at 1382, and 1386, n. 7 (Shields, J., dissenting).

17. The older version reads:

"(b) An agency may not adopt a rule that substantially differs from the version or versions of the proposed rule or rules published in the Indiana Register under section 24 of this chapter." (citation omitted).

18. The new version of the statute, enacted in 1993, reads:

(b) An agency may not adopt a rule that substantially differs from the version or versions of the proposed rule or rules published in the

(Burns Code Ed.Supp.1994) (hereinafter, "new version") will allow those rules to differ if the Final Rule is a "logical outgrowth" of the Proposed Rule.

While AMP finds no error in the trial court's application of the older version of the statute to the present dispute, the Board suggests that this court essentially abandon the older version's "substantial difference" test, in favor of the new version of subsection (b). The Board urges that retroactive application of the new version is justified, because the purpose of the older version's prohibition against substantial differences between proposed and final rules was meant to gauge the reaction of those entities affected and to facilitate changes that the Board found warranted due to public notice and comment.

■■■ "The long standing rule of statutory construction mandates that a law shall be prospective only in the absence of an express statement that it be retroactive." *Indiana Dept. of Environmental Management v. Chemical Waste Management of Indiana, Inc.* (1992) 2d Dist. Ind.App., 604 N.E.2d 1199, 1204, *trans. denied.* Here, the trial court made its decision on January 8, 1993. However, the effective date of the new version was July 1, 1993, seven months after the trial court rendered its initial decision upon summary judgment, but while the present case was pending upon appeal. The new version of subsection (b) does not contain any language to the effect that it should receive retroactive application; neither was an emergency declared. Therefore, since the present dispute arose while the older version was in effect, we are required to apply that version, regardless of the pending appeal, and despite the Board's argument that the legislature's change to a "logical outgrowth" test was a

direct consequence of the trial court's reading of the statute in the case below. We hold that application of the new version must be prospective only. *See Chemical Waste, supra,* 604 N.E.2d at 1204.[19]

Consequently, the trial court correctly determined that the old version of subsection (b) applied to the present case. However, we cannot say the same for the trial court's determination that summary judgment in favor of AMP was appropriate.

■■■ AMP argues that the provisions of the Final Rule "substantially differ" from those in the Proposed Rule. It asserts that the Board failed to follow the proper procedural mandates because it did not properly notify and elicit public comment upon the municipal exemption from NPDES fees, which was not present in the Proposed Rule.

To this end, the Board claims the municipal exemption, although not present in the Proposed Rule, was a natural consequence of public comment upon the original NPDES fee schedule laid out therein. Thus, the Board asserts that its procedures were not only proper and acceptable, but were an anticipated outcome of the older version's "similarity" requirement. Subsequently, the notice and comment procedures it employed inherently pass muster under either the old or the new version of subsection (b).

Indiana precedent interpreting the old version of subsection (b) is nonexistent.[20] However, both parties urge this court to adopt the analytical framework of I.C. 4–22–2–32 (Burns Code Ed.Repl.1990). That statute sets out several factors which the attorney general "shall" use in order to determine whether a final rule adopted by an agency and submitted to her "'substantially differs

Indiana Register under section 24 of this chapter, unless it is a logical outgrowth of any proposed rule as supported by any written comments submitted during the public comment period." (citations omitted).

**19.** Ordinarily, a statutory amendment changing a prior statute carries the connotation that the legislature intended that the statute be given a different meaning. *See Scheub, supra,* 617 N.E.2d 585. On the other hand, however, it has been correctly stated that a legislative amendment "may reflect their desire to express their original intention more clearly." *Indiana Dept.*

*of State Revenue v. Endress & Hauser, Inc.* (1980) 1st Dist. Ind.App., 404 N.E.2d 1173, 1175. While we might have indulged the latter proposition in construing the new version of subsection (b), it is not necessary that we do so. Our determination does not turn upon which version of the statute is utilized. The Board's action passes muster under both versions.

**20.** Neither has Indiana applied the "logical outgrowth" test of the new version of subsection (b), although it has been adopted in federal courts.

from the rule or rules published [in the Indiana Register].'" Marcia J. Oddi, *Environmental Rulemaking in Indiana: The Impact of the Substantial Difference Requirement on Public Input,* 24 Ind.L.Rev. 845, 859 (1991). Those factors are: 1) the extent to which those persons who are affected by the adopted rule should have understood from the published version that their interests would be affected; 2) the extent to which the subject matter of the adopted rule, or the issues determined in the rule, differ from the published version, and 3) the extent to which the effects of the adopted rule differ from the effects which would have occurred had the proposed rule been adopted.

Here, neither AMP nor the Board seriously contend that any party affected by the rule was unaware that it would be affected; nor do the parties claim that the subject matter of the Final Rule somehow differed from the Proposed Rule. The nexus of the debate seems to center upon the discordant effects created by the Final Rule, as opposed to the effects of the Proposed Rule. AMP contends that the Proposed Rule, unlike the Final Rule, carried with it no fee differentiation, and that the effects upon the .dischargers differed drastically because privately-owned dischargers would now be forced to "subsidize" the NPDES program through larger fees. The Board alleges that the Final Rule did not change the effects at all; the only change was the municipal exemption.

We realize that the language of I.C. 4–22–2–32(b) is nearly identical with that of the statute at issue. However, while those factors may serve as a useful guide in the analysis of the Final Rule at issue, the "substantial difference" language of subsection (b) is rendered insignificant due to the peculiar facts at hand.

Indeed, AMP's argument must fail in light of its concession, at oral argument, that it was aware of, and had an opportunity to comment upon, the suggested changes to the Proposed Rule. AMP conceded that the municipal exemption in the Final Rule was a direct result of comments made to the Proposed Rule. Essentially, AMP argues that the Final Rule should be declared invalid because the Board actually took into account public comments and debate elicited through proper administrative procedures. Under these facts, that the effects of the Proposed Rule might differ in some respects from those of the Final Rule are of no consequence, because the parties are in no worse condition than they would have been had the Proposed Rule been adopted without changes.

We reverse the summary judgment granted in favor of AMP. We further reverse and vacate the injunction entered against the Board. The cause is remanded for further proceedings not inconsistent with this opinion.

SHARPNACK, C.J., and KIRSCH, J. concur.