Cheryl SULLIVAN, in her capacity as Secretary of Indiana Family and Social Services Administration and Indiana Family and Social Services Administration, Appellants (Defendants),

v.

Petricia DAY, individually and in behalf of all others similarly situated, Appellees (Plaintiffs).

No. 49A02–9505–CV–240.

Court of Appeals of Indiana.

Feb. 20, 1996.

Rehearing Denied April 22, 1996.

Pamela Carter, Attorney General, Jon Laramore, Deputy Attorney General, Indianapolis, for appellants.

Jamie Andree, Legal Services Organization, Bloomington, Tracy T. Pappas, Legal Services Organization, Indianapolis, for appellee.

## OPINION

SULLIVAN, Judge.

The Indiana Family and Social Services Administration and its secretary, Cheryl Sullivan (collectively FSSA), appeal from the trial court's amended order of summary judgment declaring invalid FSSA's method of

determining Medicaid eligibility for disabled individuals and enjoining FSSA from following that policy.

The restated issues for our review are as follows:

(1) Did the trial court err in deciding that current state and federal law requires FSSA to determine that an individual whose medical condition will improve with treatment, but who cannot afford to pay for treatment, is disabled for purposes of Medicaid eligibility?

(2) Is Indiana's current definition of disability more restrictive than that in place on January 1, 1972, thus violating the federal Social Security Act?

We conclude that, under the current statutory and regulatory scheme, FSSA is not required to take into account an applicant's inability to pay for treatment, and to thereby determine that the applicant is entitled to Medicaid benefits for an otherwise treatable condition. However, we also conclude that the current criteria are more restrictive than those in place on January 1, 1972, because the statutory eligibility scheme in 1972 clearly contemplated that applicants with treatable conditions could qualify for medical services. Thus, we remand to the trial court with instructions to order relief not inconsistent with this opinion.

The named plaintiff in this class action, Petricia Day, is a 55–year–old woman suffering from a severe degenerative condition of her right knee which impairs her ability to walk and stand. Employed for 15 years as a nurse's aide, Day began to experience great difficulty performing her job responsibilities and was terminated in January 1992. After seeking medical treatment, she was told by her orthopedic specialist that total knee replacement surgery was required to improve her condition. Day lacked health insurance, however, and was unable to afford the recommended treatment.

Day applied for assistance under the state's Medicaid for the Disabled program. *See* I.C. 12–15–2–3 (Burns Code Ed.Repl.

1995). Although she met the financial eligibility threshold, her application was denied on the ground that she did not meet the program's medical disability requirement. Under the statute in effect at the time of Day's application, medical assistance would only be provided to those needy disabled persons who had insufficient income or other resources to provide a reasonable subsistence and had "a physical or mental impairment, disease, or loss that ... appears reasonably certain to continue throughout the lifetime of the individual without significant improvement...." I.C. 12–14–15–1(2) (Burns Code Ed.Repl.1995).[1] The administrative law judge who upheld the denial of Day's application found that because Day's condition was treatable by surgery, it was not reasonably certain that she would be substantially impaired for the remainder of her lifetime. He also noted that neither the statute nor the administrative rules allowed for consideration of Day's inability to pay for the surgery needed to treat her condition. The ALJ's decision was affirmed by FSSA.

Day filed her petition for judicial review on January 19, 1993, combined with a class action complaint for declaratory and injunctive relief for persons similarly situated. Day asserted that FSSA's refusal to consider an applicant's inability to pay for necessary treatment in determining medical disability violated state and federal law. On December 20, 1993, the parties agreed to certification of the following class of plaintiffs:

"All individuals in Indiana who have had or will have applications for benefits under Ind.Code § 12–14–15 denied ... based on the state agency's determination that they are not disabled because their conditions are treatable and therefore ... not 'reasonably certain to continue throughout the lifetime of the individual without significant improvement,' although they are unable to afford the treatment that may lead to improvement of their conditions." Record at 132.

On April 7, 1994, the plaintiffs moved for summary judgment. On May 5, 1994, FSSA

---

**1.** This definition states the requirement for eligibility to receive cash assistance payments. The tie-in to Medicaid eligibility is found at I.C. 12–15–2–3, which provides that individuals receiving cash assistance are eligible for Medicaid.

moved for summary judgment and filed affidavits in support of its motion. Both parties agreed there were no genuine issues of material fact, and filed briefs.

On December 29, 1994, the trial court entered findings of fact, conclusions of law, and judgment in favor of the plaintiffs.[2] The court declared that the agency's policy of determining Medicaid disability without taking into account the applicant's ability to pay for restorative treatment was contrary not only to the definition of disability contained in I.C. 12–14–15–1(2), but also to the purpose of the Medicaid program set forth in 42 U.S.C.A. § 1396 (West 1992), and the state Medicaid rules promulgated under 405 Ind.Admin.Code (IAC) 2–2–3(a)(1). The order enjoined FSSA from enforcing the policy.

On January 26, 1995, FSSA filed a motion to correct errors. A modified order was issued February 21, 1995 which retained the declaratory and injunctive relief contained in the initial judgment but reduced the scope of FSSA's obligation to notify class members. FSSA filed a timely praecipe and sought a stay pending appeal, which was granted on April 24, 1995. The plaintiffs asked this court to review the stay. We denied the plaintiffs' motion on June 7, 1995.

■ In the meantime, following the adverse ruling against FSSA in the lower court, the Indiana legislature amended the definition of disability contained in I.C. 12–14–15–1(2) to expressly preclude consideration of an applicant's ability to pay for treatment in determining medical disability. 1995 Ind. Acts 152. The amended definition went into effect on May 10, 1995. A non-code section[3] also adopted by the legislature provided that the amendment was "intended to be a clarification of the law and not a substantive change…." Id.

On May 16, 1995, FSSA filed a motion to vacate judgment, claiming that the new legislation eliminated the entire basis for the trial court's order. The trial court set an August 14 hearing on the motion; however, in conjunction with our order denying review of the stay, this court ordered FSSA to file the record of proceedings by June 20, 1995 and proceed with the appeal, thus divesting the trial court of jurisdiction over the motion to vacate. See Ind. Appellate Rule 3(A).

## I. Background on Medicaid Program

Medicaid is a joint federal-state program aimed at providing health care to certain low income individuals who would not otherwise be able to afford medical treatment. 42 U.S.C.A. § 1396 (West 1992). The program operates through a combined scheme of federal and state statutory and regulatory authority. See 42 U.S.C.A. § 1396a (West Supp.1995); I.C. 12–15–1–1 (Burns Code Ed. Repl.1995). State and federal governments share the expense of providing Medicaid-covered services. See 42 U.S.C.A. § 1396b (West Supp.1995); 1993 Ind.Acts 277, § 8.

To be eligible for Medicaid, individuals must meet both financial and categorical eligibility requirements. When Congress established the Medicaid program in 1965, participating states were required to provide Medicaid to individuals eligible for cash assistance under any one of four different federal-state cash assistance programs in existence at that time. 42 U.S.C. § 1396a(a)(10) (1970).[4] Individuals eligible for Medicaid by virtue of their eligibility for cash assistance were known as the "categorically needy." Schweiker v. Gray Panthers (1981) 453 U.S. 34, 36, 101 S.Ct. 2633, 2636, 69 L.Ed.2d 460. In addition, states were permitted, but not required, to offer Medicaid to the "medically

---

2. Such findings, while not binding, "offer this court valuable insight into the trial court's rationale for its judgment and facilitate appellate review." Weber v. Costin (1995) Ind.App., 654 N.E.2d 1130, 1133.

3. A "non-code" section is one which, though enacted with a piece of legislation, is not codified within the Indiana Code. Such "non-code" provisions, though uncodified, are appropriately considered by a court when interpreting a statute. See, e.g., Jones v. State (1991) Ind.App., 569

N.E.2d 975, 979 (applying the terms of an uncodified section of 1985 Ind.Acts 328, to the interpretation of I.C. 35–50–2–7.1 (1985), a codified section of the legislation.

4. Old Age Assistance, 42 U.S.C. §§ 301–306 (1970); Aid to Families with Dependent Children, 42 U.S.C. §§ 601–644 (1970); Aid to the Blind, 42 U.S.C. § 1201–1206 (1970); Aid to the Permanently and Totally Disabled, 42 U.S.C. §§ 1351–1355 (1970).

needy;" that is, individuals whose income or resources were too great to qualify for categorically needy assistance, but were nonetheless unable to pay for necessary medical expenses. *Id.; see* 42 U.S.C. § 1396a(a)(17) (1970).[5]

In 1972, Congress replaced three of the four cash assistance programs whose recipients made up the categorically needy with a new program: Supplemental Security Income for the Aged, Blind, and Disabled (SSI). 42 U.S.C. §§ 1381–1385 (Supp.1975). Because less restrictive eligibility guidelines were adopted for SSI, in some states a greater number of individuals became eligible for SSI than had been eligible under the previous cash assistance programs. *See Indiana Dep't of Pub. Welfare v. Payne* (1992) Ind. App., 592 N.E.2d 714, 719, *vacated* (1993) Ind., 622 N.E.2d 461. This expanded eligibility "portended increased Medicaid obligations for some States because Congress retained the requirement that all recipients of categorical welfare assistance—now SSI—were entitled to Medicaid." *Schweiker, supra*, 453 U.S. at 38, 101 S.Ct. at 2637. Concerned that states might withdraw from Medicaid participation rather than bear the increased costs of providing Medicaid coverage to all SSI recipients, Congress offered states the option of providing Medicaid coverage only to those individuals who would have been eligible under the state's medical assistance plan in effect on January 1, 1972. 42 U.S.C.A. § 1396a(f) (West Supp.1995) (commonly known as the "209(b) option"); *see Roloff v. Sullivan* (1992) 7th Cir., 975 F.2d 333, 335. Indiana has chosen to adopt this option in implementing its Medicaid for the Disabled program. *See* I.C. 12–15–1–5 (Burns Code Ed.Repl.1995).

**II. Current Statutory Scheme**

With respect to the current statutory and regulatory scheme, plaintiffs argue that the language of I.C. 12–14–15–1 (Burns Code Ed.Repl.1995), as well as that of FSSA's own promulgated regulation, 405 IAC 2–2–3 (1992), prohibit FSSA from "presuming" that a Medicaid applicant's disabling condition is treatable without considering whether the applicant can afford the treatment. FSSA responds that its policy of not taking inability to pay into account comports with the language of both the statute and the regulation. We conclude that, at the time this cause arose, and without regard to the 1995 amendment, the statute and regulation were susceptible to either reading, and since the statute and regulation do not contradict FSSA's interpretation, we reject plaintiffs' contention that FSSA's interpretation is in contravention of the statutory and regulatory terms.

The statutory definition of disability under which Day's application was denied is found at I.C. 12–14–15–1(2) (Burns Code Ed.Repl. 1995), which provides that an individual must have "a physical or mental impairment, disease, or loss ... *that appears reasonably certain to continue throughout the lifetime of the individual without significant improvement* and that substantially impairs the individual's ability to perform labor or services or to engage in a useful occupation" (emphasis supplied). No further explanation of this definition was at that time found within the statute;[6] indeed, I.C. 12–14–15 contains only the above section (which includes a number of other eligibility criteria), and a section prohibiting inmates from receiving assistance while incarcerated.[7]

---

**5.** Indiana has opted not to extend Medicaid coverage to the "medically needy." *Roloff v. Sullivan* (1992) 7th Cir., 975 F.2d 333, 335.

**6.** In the wake of the trial court's decision in this case, the Indiana legislature enacted 1995 Ind. Acts 152, § 4, effective May 10, 1995. This law amended I.C. 12–14–15–1(2) to include the following language: "The determination of medical disability under this subdivision shall be made without reference to the individual's ability to pay for treatment." *See* I.C. 12–14–15–1(2) (Burns Code Ed.Supp.1995). An uncodified portion of the legislation provided that, "IC 12–14–15–1, as amended by this act, is intended to be a

clarification of the law and not a substantive change in the law." 1995 Ind.Acts 152, § 24. Because we decide that even prior to this amendment the 1992 statute did not require FSSA to take into account an applicant's ability to pay for treatment, we need not decide what effect, if any, this amendment has on our construction of the statute. We will, however, address the legislative amendment in greater detail *infra*.

**7.** *See* I.C. 12–14–15–2. As will be discussed *infra*, the current statutory scheme is a significantly "pared-down" version of previous codifications of the statutory scheme for assistance to the disabled. The current scheme dates to 1992,

The dispute in this case is one of statutory interpretation; in effect it hinges upon the circumstances under which a Medicaid applicant's condition is "reasonably certain to continue throughout the lifetime of the individual". Plaintiffs assert that, if an applicant cannot afford treatment which more likely than not will remove or cure the condition, then that condition is "reasonably certain" to continue throughout the applicant's lifetime, thus bringing the applicant within the purview of the definition. FSSA counters that, if treatment is available to remove or cure the applicant's condition, then that condition is not "reasonably certain" to continue throughout the applicant's lifetime, irrespective of the applicant's ability to in fact pay for the treatment.

▮ The threshold inquiry in cases of statutory interpretation is whether the statute is ambiguous. *Meier v. American–Maize Products Co.* (1995) Ind.App., 645 N.E.2d 662, 668, *modified on reh'g,* 650 N.E.2d 741, *trans. denied.* Only when a statute is ambiguous is it susceptible to judicial interpretation. *Id.; One 1968 Buick, Four Door v. State* (1994) Ind.App., 638 N.E.2d 1313, 1316; *Joseph v. Lake Ridge Sch. Corp.* (1991) Ind. App., 580 N.E.2d 316, 319, *trans. denied.* A statute is ambiguous when the wording of the statute "arguably supports either of the competing interpretations advocated by the parties." *Miller v. Bryant* (1994) Ind.App., 644 N.E.2d 188, 191, *trans. denied.*

▮ It is apparent to us that, considering the language of the statute, either of the parties' readings is plausible. When we construe a statute's meaning, we look first to the language of the statute itself, and we accord words their "ordinary and common usage", *Meier, supra,* 645 N.E.2d at 668, unless the legislature has provided a specific definition. *Tillman v. Snow* (1991) Ind.App., 571 N.E.2d 578, 579–80. As stated, nowhere in the statute itself is there an indication of what is intended by "reasonably certain." On the one hand, it seems plain that, if an applicant cannot afford treatment to remedy a condition, and that condition is not likely to abate without treatment, then the condition is "reasonably certain" to continue throughout that applicant's lifetime without significant improvement. Conversely, FSSA's assertion that only those conditions which are not currently susceptible to treatment are in fact "reasonably certain" to continue throughout an applicant's lifetime, is not directly contradicted by the statute's terms.

▮ Where, as here, the plain language of the statute does not clearly resolve the issue, and there is no prior binding interpretation, we will consider the regulations promulgated pursuant to the statutory language by the agency charged with the statute's enforcement. *Hamilton County Dep't of Pub. Welfare v. Smith* (1991) Ind.App., 567 N.E.2d 165, 169. An administrative regulation which been long and consistently followed may be given great weight. *See First Nat'l Bank of Danville v. Reynolds* (1986) Ind.App., 491 N.E.2d 218, 222, *trans. denied.* However, courts are charged with the responsibility of resolving questions of statutory construction, and thus, are not bound by the agency's interpretation. *Briggs v. Review Bd. of the Indiana Dep't of Workforce Dev.* (1995) Ind.App., 648 N.E.2d 1225, 1227.

Unfortunately, consideration of the language of the regulation does not itself answer our question, for the plaintiffs and FSSA disagree about the interpretation of FSSA's own pertinent regulation, found at 405 IAC 2–2–3 (1992). Thus, we must interpret the regulation itself, and to do so we will employ the same rules utilized when construing a statute. *Peabody Coal Co. v. Indiana Dep't of Natural Resources* (1994) Ind.App., 629 N.E.2d 925, 930, *reh'g denied; Hamilton County Dep't of Pub. Welfare, supra,* 567 N.E.2d at 169. Both parties point us to the

when the legislature re-enacted portions of the prior scheme and repealed others. *See* 1992 Ind.Acts 2; I.C. 12–1–7.1 (Burns Code Ed.Repl. 1988). While alterations and deletions in a statutory scheme are obviously relevant in determining a statute's current meaning, *see Frey v. Review Bd. of the Indiana Empl. Sec. Div.* (1983)

Ind.App., 446 N.E.2d 1341, 1344, and we will ultimately rely upon statutory evolution in our disposition of this case, we focus in this discussion upon the current scheme since the parties have framed their arguments in terms of the current scheme.

language of 405 IAC 2–2–3, which provides that:

"The determination of whether a condition appears reasonably certain to continue throughout the lifetime of the individual without significant improvement is made on the basis of the expected duration of the condition. *A condition which is expected to continue indefinitely fulfills this requirement whereas one that is temporary or transient does not.* The expected duration of the condition does not preclude the possibility of future medical advances, changed diagnosis or prognosis, unforeseen recovery or successful treatment subsequent to the initial prognosis." 405 IAC 2–2–3(a)(1) (1992) (emphasis supplied).

The plaintiffs claim that, while the regulation clearly indicates that conditions which are temporary or transient do not fulfill the requirement, applicants with treatable conditions who are unable to afford the treatment which will cure or alleviate their conditions are not excluded by the regulation's language, because their conditions are expected to continue indefinitely. FSSA counters that nothing in the regulation contradicts its policy of refusing to consider an applicant's ability to pay for treatment in concluding that an applicant whose condition is treatable does not meet the disability requirement.

We are unable to conclude with confidence that either reading of the regulation is facially incorrect. Just as the statutory meaning turns on the phrase "reasonably certain to continue throughout the lifetime of the individual", which is susceptible to either the plaintiffs' or FSSA's interpretation, the regulation turns on whether the condition "is expected to continue indefinitely" or is "temporary or transient". One could readily argue that an applicant with a treatable condition, but who cannot afford the treatment, has a condition that is "expected to continue indefinitely", because the condition will only improve with treatment which the applicant cannot afford. However, one could also argue that an applicant with a treatable condition has only a "temporary or transient" condition, because the condition will likely improve with treatment. Neither party has convinced us that, considering the language and context of the statute and regulation, we should favor one reading over another.

Despite the lack of clarity within the text of the statute and regulation themselves, it is undisputed from the record that FSSA has been and continues to interpret I.C. 12–14–15–1 and 405 IAC 2–2–3 in a manner consistent with the arguments it has made before this court. FSSA is the agency charged with interpreting the statute and regulation in the first instance, and its interpretation is entitled to some deference unless it is erroneous. *See Peabody Coal, supra,* 629 N.E.2d at 930. Plaintiffs have offered a plausible reading of the statute and regulation; they have not, however, shown us that FSSA's differing reading and interpretation of the statute and regulation are contrary to the language of either. Under this circumstance, we have no basis for determining that FSSA's denial of Medicaid to Day and other similarly situated persons is erroneous under the current statutory and regulatory scheme.[8]

## III. 209(b)

### A. Indiana's Statutory Scheme in 1972

As previously stated, the case at bar is not resolved merely by construing Indiana's cur-

8. Contrary to the trial court's conclusion, FSSA's interpretation does not violate 42 U.S.C. § 1396 (1992), which provides appropriations "[f]or the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of ... disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such ... individuals attain or retain capability for independence or self-care...." Although social legislation must be construed in favor of those intended to benefit from it, *Control Bd. v. Town of Wolcott* (1982) Ind.App., 433 N.E.2d 62, 65; *State v. Kokomo Tube* (1981) Ind.App., 426 N.E.2d 1338, 1345, states are allowed to fashion their own definition of who is "disabled," which means that Indiana's definition of disability establishes the scope of who the "intended beneficiaries" are. Indiana's latitude in so defining disability is, of course, constrained by the requirement of section 209(b) that the definition cannot be more restrictive than that in place on January 1, 1972. 42 U.S.C.A. 1396a(f) (West Supp.1995).

rent statutory definition of Medicaid disability. Under the federal 209(b) option, codified by statute at 42 U.S.C.A. § 1396a(f) (West Supp.1995),[9] and by regulation at 42 C.F.R. § 435.121(a)(2) (1994),[10] and applicable to Indiana, a state's Medicaid eligibility requirements may be no more restrictive than those in place on January 1, 1972. *Indiana Dep't of Pub. Welfare v. Payne* (1994) Ind., 622 N.E.2d 461, 464, *reh'g denied.* As a result, if an individual would have been eligible for Medicaid under the state's Medicaid plan in effect on January 1, 1972, the state is required to provide Medicaid benefits to that individual, regardless of the current eligibility requirements. *See Roloff, supra,* 975 F.2d at 335.

Although previous Indiana cases have addressed financial eligibility requirements under the 1972 statutory scheme, *see, e.g., Payne, supra,* 622 N.E.2d 461, our appellate courts have not been called upon to construe the disability requirement which was in effect for Medicaid applicants on January 1, 1972.

As the parties agree, the language contained in I.C. 12–14–15–1(a), referring to "a physical or mental impairment, disease, or loss ... that appears reasonably certain to

continue throughout the lifetime of the individual without significant improvement", was present in nearly identical form in 1972. *See* I.C. 12–1–7–29(a) (1971) ("Section 29").[11]

▮ In determining the disability requirement in effect on January 1, 1972, however, we look not only to this language, but to the entire statutory scheme which was in place to provide services to persons with disabilities (hereinafter referred to as either "1972 statute" or "1972 statutory scheme"). When interpreting the words of a single section of a statute, we must construe them with all other sections of the act. *Valadez v. R.T. Enterprises* (1995) Ind.App., 647 N.E.2d 331, 332–33. We must view the language within the context of the entire act, rather than in isolation. *One 1968 Buick, supra,* 638 N.E.2d at 1317. "As logical as the plain meaning of the statute might seem, it is axiomatic that an individual statute may not be construed in isolation. (citation omitted) Instead, various provisions of a statute must be construed so as to impart consistent interpretations in the context of an act as a whole...." *Meier, supra,* 645 N.E.2d at 669.

We have already construed the aforementioned language under the current statutory

9. 42 U.S.C.A. § 1396a(f) (West Supp.1995) provides in relevant part:

"[N]o state not eligible to participate in the State plan program established under subchapter XVI ... shall be required to provide medical assistance to any aged, blind, or disabled individual (within the meaning of subchapter XVI of this chapter) for any month unless such State would be (or would have been) required to provide medical assistance to such individual for such month had its plan for medical assistance approved under this subchapter and in effect on January 1, 1972, been in effect in such month...."

This language provides, perhaps, insight into Justice Powell's description of the Medicaid statutes as "byzantine". *Schweiker, supra,* 453 U.S. at 43, 101 S.Ct. at 2640.

10. Under 42 C.F.R. § 435.121(a)(2) (1994), the agency administering Medicaid in states which elect the 209(b) option may do the following:

"elect to apply more restrictive eligibility requirements to the aged, blind, and disabled that are more restrictive than those of the SSI program. The more restrictive requirements may be no more restrictive than those requirements contained in the State's Medicaid plan in effect on January 1, 1972. If any of the State's 1972 Medicaid plan requirements were

more liberal than that of the SSI program, the State must use the SSI requirement instead of the more liberal requirements...."

11. The specific language of Section 29 reads:

"Assistance shall be given under the provisions of this act to any needy disabled person hereinafter referred to as 'disabled person' who:

(a) has a physical or mental impairment, disease, or loss ... which appears reasonably certain to continue throughout the lifetime of the individual without significant improvement...."

Although the Indiana General Assembly adopted public welfare legislation in 1936, *see* 1936 Ind.Acts (s.s.) c. 3, assistance to the disabled was not added until 1961. *See* 1961 Ind. Acts c. 206. The 1961 amendments defined a disabled person as one who "[i]s permanently incapacitated ... and who is bedfast or requires the help of another person to care for him...." I.C. 52–1251a (Burns Code Ed.Repl.1964). In 1967, the definition of disability was rewritten to incorporate the Section 29 language. *See* 1967 Ind.Acts c. 264. In 1971, the statutory scheme addressing supplemental assistance to the disabled was recodified without changes at I.C. 12–1–7–29 through –50, which was the legislation in place on January 1, 1972.

and regulatory scheme not to contradict FSSA's interpretation that a person does not meet the medical definition of disability for purposes of Medicaid eligibility if his condition may be remedied by treatment, even if he cannot afford the care necessary to remedy his condition. It does not necessarily follow, however, that in 1972 this language held the same meaning, viewed in connection with the entire 1972 statutory scheme. In this regard, we observe that the current statutory scheme is a significantly "pared-down" version of that in effect in 1972. Most notably contained in the 1972 statutory scheme, and later repealed, was I.C. 12–1–7–44 ("Section 44"), which provided in relevant part that:

> "Assistance under the provisions of this act may be denied or discontinued to *any disabled person who refuses medical, surgical, or other treatment, when his disability may be partially or wholly restored by such treatment* and the extent of his dependency would thereby be lessened. A certificate in writing as to treatment and possible restoration shall be made by the examining licensed physician, and the plan of treatment approved by the state supervising physician in the state department." (emphasis supplied).

In construing a statute, we must give effect to every provision if possible. No part shall be held meaningless if it can be reconciled with the rest. *See Jones v. State* (1991) Ind.App., 569 N.E.2d 975, 978. "A statute should not be viewed as if the reader is peering at it through a keyhole. It must be read with its companions." *Id.* If the definition of disability as currently applied by FSSA, which only encompasses conditions which are untreatable, is applied to Section 29 as it existed in 1972, Section 44 would appear to be rendered meaningless. Section 44 by its terms states that a "disabled person" can refuse restorative treatment. A "disabled person" could not possibly refuse restorative treatment if by definition a person is not "disabled" if such treatment exists.

We must attempt to harmonize statutory provisions before applying any other rules of statutory construction. *Meier, supra,* 645 N.E.2d at 669 (citing *Mogilner v. Metropolitan Plan Comm'n of Marion County* (1957) 140 N.E.2d 220, 236 Ind. 298); *Board of Trustees of Indiana Pub. Employees' Retirement Fund v. Grannan* (1991) Ind.App., 578 N.E.2d 371, 375, *trans. denied.* When we read Section 29 and Section 44 together, we conclude that the criteria of Section 29 define who is a "disabled person" for purposes of the 1972 statutory scheme, and because a "disabled person" can refuse restorative treatment under Section 44, the definition of "disabled person" in Section 29 must necessarily have included those whose disabilities were treatable.

It is clear from the 1972 statutory scheme that the term "disabled person" as used in Section 29 and Section 44 was not a generic label referring to a person with any type of disability, but rather a term of art defining an individual who met specific disability criteria defined by the act. We conclude this from the use in Section 29 of the phrase "disabled persons *as defined by this act.*" *See* I.C. 12–1–7–29 (emphasis supplied). All statutory language is deemed to have been used intentionally and words or clauses in a statute are to be treated as surplusage only in the absence of any other possible course. *Brook v. State* (1983) Ind.App., 448 N.E.2d 1249, 1251. Thus, Section 29 clearly contemplated that a definition of "disabled person" existed within the parameters of the 1972 statutory scheme.

However, the section titled "Definitions", I.C. 12–1–1–1 (1971), did not include a definition of "disabled person," though other types of categorical welfare recipients were expressly defined in the section. *See* I.C. 12–1–1–1(*l* ) (defining "dependent child"); I.C. 12–1–1–1(n) (defining "crippled child"); and I.C. 12–1–1–1(o) (defining "blind"). Therefore, we consider whether the criteria in Section 29 defined a "disabled person."

The preface to Section 29 provided that "[a]ssistance shall be given ... to any needy disabled person *hereinafter referred to as 'disabled person'* who" met specific criteria which were set forth in Section 29 [12] (empha-

---

**12.** In addition to the impairment requirement, Section 29 also required persons seeking assis-

sis supplied; quotation marks in original). The use of the phrase "hereinafter referred to as 'disabled person'" in the beginning of Section 29 (which specified eligibility criteria, and in which "disabled person" was specifically set off by quotation marks), the specific reference within Section 29 to disabled persons "as defined by this act", and the absence of any other definition of "disabled person" within the act, lead to no other conclusion than that a person who met the eligibility criteria contained in Section 29 was a "disabled person" for purposes of the act.

Had the legislature not intended Section 29 to define "disabled person," it could easily have written Section 29 to read "assistance shall provided to a *person* who" meets the following criteria or "assistance shall be provided to an *applicant* who" meets the following criteria. Indeed, the term "applicant" was used elsewhere in the 1972 statutory scheme, see I.C. 12–1–7–33, –35 (1971), as are the words "person," I.C. 12–1–7–19 (1971), and "recipient," I.C. 12–1–7–31 (1971).[13] Further, it appears from the other usage of the term "disabled persons" in the 1972 statutory scheme that the legislature intended the phrase to mean "person eligible for assistance." *See* I.C. 12–1–2–16(f) (1971) (establishing a needy disabled person account); I.C. 12–1–7–33 (1971) (requiring applicants for assistance as a disabled person to file applications in their county of residence); I.C. 12–1–7–35 (1971) (requiring applicants for assistance as a disabled person to undergo a physical examination).

Since "disabled person" under Section 29 meant a person who "has a physical or mental impairment, disease, or loss ... which appears reasonably certain to continue throughout [his] lifetime", and Section 44 allowed the state to deny or discontinue assistance to "any disabled person who refuses medical, surgical, or other treatment, when his disability may be partially or wholly restored by such treatment", the definition of medical disability in Section 29(a) must necessarily have encompassed the concept of treatability. Section 44 and Section 29 can only be reconciled by construing Section 29(a) to read "reasonably certain to continue throughout the lifetime of the individual without significant improvement" *unless treated.* A treatable condition which goes untreated will continue just as will a condition for which no treatment exists, and we conclude that Indiana's definition of disability in 1972 included within its parameters those conditions which, though disabling, were treatable.

Whether a "disabled person" qualified for "medical assistance" under the 1972 statutory scheme, however, requires further analysis, for Section 29, by its terms, only provided "assistance" for disabled persons.[14] Indiana Code 12–1–7–18 (1971) ("Section 18") provided that "[m]edical assistance *shall* be granted to an applicant who is eligible for medical assistance under one (1) of the categories set out in section [12–1–7–15(a) ]" (emphasis supplied). Under I.C. 12–1–7–15(a) (1971) ("Section 15"), "medical assistance" meant "payment to or on behalf of part or all of the cost of medical or remedial services for: (1) individuals *who are receiving monthly assistance payments* ... under

---

tance to meet certain age, residency, and income requirements.

**13.** Additionally, as discussed *infra,* the current regulatory refusal of treatment provisions apply to "recipients", as opposed to "disabled persons". 470 IAC 2.1–1–2(f) (1995).

**14.** Section 29 provided that "[a]ssistance shall be given under the provisions of this act to any ... 'disabled person'". "Assistance" was defined in the act as "money payments, or services of any kind whatsoever, and from whatsoever source derived, paid or furnished to or for the benefit of any aged or blind person ... and money payments to or for the benefit of dependent, crippled and other children...." I.C. 12–1–1–1 (1971).

Although I.C. 12–1–1–1 did not include the term "disabled person," we note that as of 1971, this section of the welfare statutes had last been amended in 1945, some 16 years before the state began providing assistance to persons with disabilities. If the legislative intent can be discerned from the statute, courts may read into the statute words which have been inadvertently omitted. *Fidelity Fin. Serv. v. Sims* (1994) Ind. App., 630 N.E.2d 572, 574. It would be illogical to provide "assistance" to disabled persons, as was required by Section 29, if "assistance" did not include services or payments for those disabled persons. Therefore, we conclude that the words "disabled persons" were inadvertently omitted from 12–1–1–1.

one of the public assistance categories...." (emphasis supplied).[15] In addition, 12–1–7–31 (1971) provided that "when a [disabled] recipient is found to be in need of medical care, payment for any necessary care may be included in the monthly [assistance] award ... [or] ... may be made directly to the person, corporation, association, institution or agency furnishing such care."[16]

A person who met the disability criteria in Section 29 would, under the terms of Section 29, have been eligible for monthly assistance payments, unless he "refused" treatment under Section 44. Under Section 15 and Section 18, persons who received monthly assistance payments were also granted medical assistance. Because disabled individuals with treatable disabilities were entitled to monthly assistance payments, Section 18 required that the state "shall" provide them with medical services.[17]

The word "shall" is to be construed as mandatory unless it appears clear from either the context or the purpose of the statute that the legislature intended a different meaning. *Clark v. Kenley* (1995) Ind. App., 646 N.E.2d 76, 78, *trans. denied*. By construing the word "shall" in Section 18 as mandatory, we hold that on January 1, 1972, the state was required to provide medical treatment to persons who met the eligibility criteria of Section 29, including the requirements that they lacked "sufficient income or other resources to provide a reasonable sub-

**15.** This inartfully drafted provision must be read to provide for payment to either the medical services provider or to the person or entity who has paid for such services.

**16.** This provision had been amended as recently as 1967. 1967 Ind.Acts, c. 264, § 2. As previously noted, Congress created Medicaid in 1965; thus, in amending this language providing for medical care the legislature was presumably aware of the creation of the federal Medicaid program. As previously noted, under the terms of the federal Medicaid program, participating states were required to provide Medicaid coverage to "categorically needy" individuals receiving assistance payments. *See* 42 U.S.C.A. § 1396a(a)(10) (West 1992).

**17.** We recognize that eligibility for "medical assistance" was conditioned not on the fact that a person was "disabled" for purposes of Section 29, but that he was "receiving monthly assistance payments". I.C. 12–1–7–15 (1971). Further, Section 44 did not specifically state that the "medical, surgical, or other treatment" designed to "partially or wholly restore[ ]" the disabled person's disability, would not have to be paid for by the disabled person himself, and that assistance could be *"denied* or discontinued" to a disabled person who "refuses" treatment. Thus, it would not be an illogical reading of Section 44 to say that, even if an applicant with a treatable disability met the Section 29 criteria, and thus qualified as a "disabled person," an otherwise eligible "disabled person" would never (because of Section 44) access assistance payments under Section 29, and thereby access medical assistance under Section 15 and Section 18, unless he paid for the restorative treatment himself.

We think this reading of Section 44, though not wholly illogical, is not the better reading for two reasons. First, the effect of reading Section 44 as forcing the "disabled person" to pay for his own treatment would be to force an applicant to pay for his own restorative care when he had already qualified as a "disabled person" for purposes of Section 29, and thus had met not only the medical definition, but also had demonstrated that he had "[in]sufficient income or other resources to provide a reasonable subsistence compatible with decency and health."

More importantly, this reading would create a paradox with regard to the entire assistance scheme. If the "disabled person" in fact did provide his own restorative care, and his disability is alleviated, that person would cease to be a "disabled person" under Section 29. Thus, the assistance scheme would, under this reading, have allowed the treatable "disabled person" to qualify under the medical definition, but would have denied him assistance until he agreed to provide, for himself, treatment which would have caused him to no longer qualify under the medical definition. Conversely, Section 44 cannot reasonably be read as a provision "forcing" disabled persons to undergo treatment to "prove" that their disabilities were untreatable, since we have already concluded that a person with a treatable disability qualified as a "disabled person" under Section 44.

We think the far better reading is that, when an applicant met the Section 29 criteria, and thus was a "disabled person" for purposes of the assistance scheme, that person could *nonetheless* have his application for assistance denied (or have his assistance discontinued), when he "refuses" treatment *for which he was eligible under Section 15,* "when his disability may be partially or wholely restored by such treatment, and the extent of his dependency would thereby be lessened." I.C. 12–1–7–44 (1971). Thus, the purpose of Indiana's refusal provision would appear to have been to exclude those individuals with treatable disabilities who would rather receive assistance payments than submit to treatment for which they were eligible which would enable them to return to work.

sistence compatible with decency and health", I.C. 12–1–7–29(e) (1971), and that they had an impairment, disease or loss which "appears reasonably certain to continue throughout [their] lifetime", *including* those whose disabling conditions, though not likely to improve without treatment, were nonetheless treatable. I.C. 12–1–7–29(a) (1971). Because this was a less restrictive eligibility requirement than the requirement as currently interpreted and applied by FSSA, the state is in violation of Section 209(b).[18]

Given that our conclusion is based upon the clear language of the 1972 statute read as a whole, there is no need to determine agency practice at that time. It is unnecessary to consider agency practice because, if the Department of Public Welfare (FSSA's predecessor in administering Medicaid; hereinafter "DPW") was denying Medicaid on grounds that an applicant's otherwise disabling condition was treatable, it was acting contrary to the clear language of the statute.[19] *Our legal determination concerning Indiana's definition of disability in the 1972*

18. Section 209(b) requires Indiana to offer medical assistance to those disabled persons eligible under the state's Medicaid plan in effect on January 1, 1972. 42 U.S.C.A. § 1396a(f) (West Supp. 1995). Although a copy of the state's 1972 Medicaid plan was not submitted with the record, the 1972 statute directed the state Department of Public Welfare to administer the Social Security Act in the manner prescribed by Indiana law. I.C. 12–1–2–17 (1971). Therefore, by statute, the Medicaid plan was required to conform with law. In addition, the department's own regulation required it to provide medical care to disabled persons as defined in the welfare act. Regulation 2–111 provided that "[m]edical care should be available to all recipients of public assistance as defined in Regulation 2–100." This regulation did not contain a definition of disability; instead, it merely defined public welfare as money payment or services of any other kind furnished to or for the benefit of any aged, blind or disabled person as provided in the welfare act.

We also note that the 1972 statute limited "medical assistance" to only those services for which federal financial participation was available. I.C. 12–1–7–15(b) (1971). 45 C.F.R. § 233.10(b)(4) (1972) provided that federal financial participation was available in assistance payments which were continued, in accordance with a state plan, for a period during which the effects of an eligibility requirement were being overcome. The C.F.R. provision cited disability of a recipient of Aid to the Permanently and Totally Disabled as a medical eligibility criterion which could be "overcome" by the recipient. Thus, this provision would appear to allow federal reimbursement for treatable conditions. In so reading, we are guided by I.C. 12–1–2–13 (1971) which instructs us that the provisions of federal laws relating to handicapped and needy persons "shall be construed so as to secure to the state of Indiana and local units of government maximum participation in the benefits of said federal laws."

19. We note that reported decisions are not particularly instructive with regard to agency construction during the relevant time period. In *Indiana Dep't of Pub. Welfare v. Anderson* (1976), 171 Ind.App. 375, 357 N.E.2d 267, the plaintiff was unable to work as the result of a broken ankle which did not heal properly. She discon-

tinued outpatient therapy after a year and sought benefits under the supplemental disability program. In making a preliminary determination of Anderson's disability on April 13, 1973, her physician referred to DPW's Handbook of Public Assistance. Confused by the language of the forms, the doctor characterized her conditions as "temporary" and checked the box marked "yes" in response to the question whether the disability could be "substantially reduced by treatment." On the same form, however, he also verified that Anderson had an impairment "which appears reasonably certain to continue throughout the lifetime of the individual without significant improvement[.]" 357 N.E.2d at 269. The county welfare department denied her application on May 22, 1973, citing that she was "[n]ot totally and permanently disabled." *Id.* In a hearing before a hearing officer on July 27, 1973, the physician testified that had he understood the terminology in the Handbook of Public Assistance, he would have classified her disability as permanent, in that she had "a severe, slowly progressive major disability which *may* respond favorably to treatment[.]" 357 N.E.2d at 270 (emphasis in original). At the time of the hearing, Anderson was receiving physical therapy.

The State Medical Review Team denied Anderson's application, finding that Anderson was "not permanently and totally disabled. Her medical condition in all probability can be substantially reduced by treatment if she would only submit herself to treatment." *Id.* Upon presentation of evidence that Anderson had submitted to treatment, the board upheld its denial on the sole basis that her condition " 'was not totally disabling and in all probability can be substantially reduced.' " 357 N.E.2d at 271. In reviewing the *Anderson* decision and record, it is unclear whether the State Medical Review Team's denial of benefits was based on Anderson's disability not being "total", her potential recovery, her alleged refusal of treatment, or a combination of these factors. Upon appeal, this court found that Anderson was disabled within the meaning of the statute, because the "only stated reasons for the denial of benefits have no foundation in the ... record." 357 N.E.2d at 274. The evidence of record did not support the panel's

statute is a determination of law which is not dependent upon the factual issue of the agency's practice.

## B. Comparison to Federal SSI Program

Plaintiffs cite numerous federal decisions for the proposition that it "ignores economic reality", Brief of Appellees at 17 (quoting *Lovelace v. Bowen* (1987) 5th Cir., 813 F.2d 55, 59), not to take into account whether an applicant can pay for remedial treatment in determining whether the applicant is disabled. FSSA counters that, given Indiana's decision not to adopt the SSI standard of disability, federal decisions interpreting the SSI disability criteria are not of persuasive value. We agree with FSSA that there are relevant differences between the SSI program and Indiana's Medicaid scheme, but we conclude that the differences actually serve to illustrate Indiana's decision, in contrast to SSI, to incorporate treatability into its disability determination.[20]

The SSI definition of disability is different from Indiana's disability definition. To be disabled for SSI purposes, an applicant must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months". 42 U.S.C.A. § 1382c (a)(3)(A) (West 1992). Like Indiana's statute, this definition does not explicitly state whether the condition can be expected to continue throughout the durational requirement (twelve months for SSI versus permanently for Indiana) due to the impairment's untreat-

ability or unless treatment for the impairment is received. However, comparison of the relevant C.F.R. provisions interpreting SSI, with the former Indiana code provisions addressing refusal of treatment, along with federal case law interpreting SSI, demonstrates that, unlike Indiana's 1972 statutory scheme, the SSI definition of disability excludes applicants whose conditions are remediable.

As hereinbefore noted, Indiana's 1972 definition of disability can only be understood when read along with Indiana's "refusal of treatment" provision, which by its terms presumes that it is a "disabled person" as defined by the statute, who might refuse restorative treatment. By contrast, the language of SSI's refusal of treatment provision, found at 20 C.F.R. § 416.930 (1994), explicitly states that, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled ... or, if you are already receiving benefits, we will stop paying you benefits." § 416.930(b). This provision has been interpreted to mean that, if a condition "can reasonably be remedied either by surgery, treatment, or medication", it is not disabling. *Lovelace, supra,* 813 F.2d at 59.

This definitional distinction is understandable. Under a cash assistance program like SSI, which is by its nature designed only to provide maintenance payments without medical assistance, there is a logical reason to define disability to exclude those applicants who could have their disability remediated, since to include those persons could discourage some applicants from seeking remedial

---

conclusion that Anderson was not totally disabled, nor that her disability could be reduced, nor the Medical Review Team's assertion that she refused treatment; thus this court did not expressly reach the issue of whether she would have been granted benefits had her condition been treatable.

20. Plaintiffs also argue that, "[t]he case for taking into account an applicant's inability to afford treatment is even more compelling in the Medicaid context than in the federal disability programs under the Social Security Act." Brief of Appellees at 17. They reason that, unlike the federal disability programs, which do not necessarily carry with them a medical assistance component, and thus may extend throughout the

recipient's lifetime, eligibility for Medicaid will provide a recipient with the very treatment necessary to end his disability, thus allowing his Medicaid eligibility to be "terminated" upon successful completion of the treatment. Notwithstanding the "common-sense" appeal of this argument, our ultimate decision for plaintiffs in this case is based on the language of Indiana's Medicaid scheme as it existed in 1972, as opposed to our subjective judgment concerning who "should" be covered by Medicaid. The internal coherence of the argument, however, does provide support for our conclusion that Indiana's disability definition included treatability when adopted.

treatment (for which the applicant would have to pay) which would enable them to become self-sufficient and end their eligibility. In effect, if there is treatment available, the SSI provision "forces" the applicant to undergo treatment at his own expense to demonstrate that his condition is not remediable. *See Johnson v. Bowen* (1989) 8th Cir., 866 F.2d 274; *see also Villa v. Sullivan* (1990) 5th Cir., 895 F.2d 1019 (interpreting social security disability insurance provisions which, because virtually identical to SSI, courts rely on "without distinction"; *Lovelace, supra,* 813 F.2d at 57). However, the federal courts have opted to interpret the SSI provision not to allow for refusal of benefits when an applicant cannot pay for treatment, on the theory that it is paradoxical to condition benefits in a welfare program on an applicant's undergoing treatment the applicant cannot afford. *Lovelace, supra,* 813 F.2d at 59; *see generally* William G. Phelps, Annotation, *Social Security: Right to disability benefits as affected by refusal to submit to, or cooperate in, medical or surgi-*

*cal treatment,* 114 A.L.R. Fed. 141, § 3 (collecting federal cases analyzing inability to pay as reason for failing to comply with treatment; hereinafter "Phelps").[21]

By contrast, in a medical services program for the indigent such as Medicaid, there is not the commensurate basis for excluding from the disability definition those whose conditions can be remediated, since the very purpose of Medicaid is to provide medical services to the indigent, who will not be likely to afford to pay for those services themselves. *See* 42 U.S.C.A. § 1396 (West 1992) The refusal provision thus served to exclude from coverage those who, despite being offered remedial care, nonetheless chose to refuse that care. In this sense, Indiana appears to have utilized its refusal provision as a means of excluding those otherwise eligible indigent individuals who preferred to remain on the welfare rolls rather than accepting the offered medical treatment which was necessary for them to become self-sufficient.[22]

---

**21.** Even those federal courts which have refused to excuse an applicant from compliance with a treatment plan on poverty grounds appear to have recognized the general rule that inability to pay does provide adequate excuse, while noting that the applicant in the case before them did not make an adequate showing of inability to pay. *See* Phelps, *supra* § 3[b], and cases cited therein.

**22.** We are cognizant of the federal requirement in place in 1972 that a state Medicaid plan must "[c]ontain a definition of permanently and totally disabled, showing that: (i) 'Permanently' is related to the duration of the impairment or combination of impairments ...", 45 C.F.R. § 248.80 (1972), and Indiana's apparent incorporation of certain portions of the "recommended" definition of "permanent" disability located in 45 C.F.R. § 233.80 (1972) and § 248.80 (1972), into the Medicaid Manual as promulgated in 470 IAC 9–2–2 (1979). The "recommended" federal definition contained the following language:

> 'Permanently' refers to a condition which is not likely to improve or which will continue throughout the lifetime of the individual; *it may be a condition which is not likely to respond to any known therapeutic measures, or a condition which is likely to remain static or to become worse unless certain therapeutic procedures are carried out, where treatment is unavailable, inadvisable, or is refused by the individual on a reasonable basis;* 'permanently' does not rule out the possibility of vocational rehabilitation or even possible recovery in light of future medical advances or changed progno-

sis; in this sense the term refers to a condition which continues indefinitely, as distinct from one which is temporary or transient...." 45 C.F.R. § 233.80, 248.80 (1972) (emphasis supplied).
Indiana Administrative Code 9–2–2(71.1) (1979), tracked this language very closely, with the exception that "not likely to respond to any known therapeutic procedures" was included, while "or a condition which is likely to remain static or to become worse unless certain therapeutic measures are carried out, where treatment is unavailable, inadvisable, or is refused by the individual on a reasonable basis" did not appear.
Standing alone, this might serve to undermine the conclusion that Indiana incorporated treatability into its disability definition. However, just as the statute must be read as a whole to determine its meaning, *One 1968 Buick, supra,* 638 N.E.2d at 1317, so must the administrative code, *Payne, supra,* 622 N.E.2d at 465. Further examination reveals that the federal language relating to "where treatment is unavailable, inadvisable, or is refused by the individual on a reasonable basis" appears to be found in the IAC provision dealing with refusal of treatment, 470 IAC 9–2–2(74.2) (1979). This provision was based on I.C. 12–1–7.1–15 (1973), which tracked the relevant language (with one difference which will be discussed *infra* but which is not pertinent here) in Section 44 that it was a "disabled person" who would have his assistance denied or discontinued if he refused treatment. Thus, we conclude that the IAC in fact contemplated both aspects of the

## IV. Evolution of Indiana's Statutory Scheme

Our conclusion that the meaning of "disabled person" has evolved over time, while mandated by the language and context of the 1972 and current statutory and regulatory schemes, merits a discussion of the statutory evolution.[23]

The parties agree that the phrase, "reasonably certain to continue throughout the lifetime of the individual without significant improvement" has been part of Indiana law since 1967. *See* I.C. 12–1–7–29 (1971); I.C. 12–1–7.1–1 (1973); I.C. 12–14–15–1 (Burns Code Ed.Supp.1995). As we discuss *infra*, however, other portions of the statutory scheme which must also be used in construction have been amended or repealed by the legislature over the years.

The first major legislative change to the 1972 statute occurred in 1973, when, in response to the newly enacted SSI program, the statutory provisions regarding assistance to disabled persons were repealed by 1973 Ind.Acts 106, and re-enacted with amendments as I.C. 12–1–7.1–1 to –17. (1973). Under the new statutory scheme, the provision defining eligibility for assistance (called "supplemental assistance" under the revised scheme), was expanded to include eligibility for SSI as an alternative basis for eligibility for supplemental assistance. *See* I.C. 12–1–7.1–1(a) (1973). Reflecting Indiana's decision not to incorporate the SSI definition of disability into its Medicaid scheme, however, only those SSI recipients who would have been eligible for medical care under requirements in effect on January 1, 1972 were entitled to medical care. *See* I.C. 12–1–7–15(a)(4) (1973).[24]

The refusal of treatment provision found at Section 44 in the 1971 statute was also amended in 1973 to read:

"recommended" definition of permanent; permanent because untreatable, and permanent though treatable, with provision for denial or discontinuance of benefits to a disabled individual who refuses treatment for his treatable condition.

DPW's Medicaid Manual was first promulgated in the IAC in 1977. Prior to this, DPW procedures were contained within a Public Assistance Manual, which was not promulgated within the IAC. Portions of the Manual in effect in 1973 were quoted in *Indiana Dep't of Pub. Welfare v. Anderson* (1976) 171 Ind.App. 375, 357 N.E.2d 267; however, our examination of the documents available at the Indiana State Library did not disclose a copy of the Medicaid Manual in effect in 1972.

23. We are not compelled to offer this explanation for purposes of reaching our decision, since the relevant statutory provision is found in 1972, and our decision is based upon the clear language of that statute, irrespective of how it was amended over time to become the current scheme. We nonetheless endeavor to explain this evolution for two reasons: first, the admittedly peculiar nature of our conclusion that the same language can have different meanings as its context changes over time may require a more thoroughgoing explanation of exactly how that context did change; and second, explanation of the significant changes in the statutory scheme demonstrates that the doctrine of legislative acquiescence, on which FSSA relies quite heavily, is not appropriate for this case. Whatever force the doctrine of legislative acquiescence may have in other contexts, it is entitled to no weight in this case because since January 1, 1972, the statutory

scheme for assistance to persons with disabilities has been amended a number of times.

In a somewhat related argument, FSSA also asserts that the long-standing administrative interpretation excluding an applicant's ability to pay is entitled to great weight as a matter of primary interpretation, as opposed to legislative acquiescence. Brief of Appellants at 12. An administrative agency's interpretation of a statute which it is charged with enforcing may be considered by the courts in interpreting a statute. *See Natural Resources Comm'n v. Porter County Drainage Bd.* (1991) Ind., 576 N.E.2d 587, 589; *Briggs v. Review Bd. of the Indiana Dep't of Workforce Dev.* (1995) Ind.App., 648 N.E.2d 1225, 1227; *Lowell Health Care Ctr. v. Jordan* (1994) Ind.App., 641 N.E.2d 675, 678, *trans. denied.* Indeed, as we have discussed, we find the agency's interpretation to be of some use in construing the current statutory scheme. However, longstanding administrative interpretations which are incorrect are not entitled to any weight. *Beer Distrib. of Indiana, Inc. v. State Alcoholic Beverage Comm'n* (1982) Ind.App., 431 N.E.2d 836, 840. Since the current administrative interpretation, which excludes applicants with treatable conditions from receiving Medicaid, is in contravention of the clear language of the 1972 statute, we accord it no weight with respect to the interpretation of that statute.

24. Although states were generally allowed to "restrict" eligibility for Medicaid to those individuals eligible as of January 1, 1972, states were required to allow an applicant to "offset incurred medical expenses from income." *Roloff, supra,* 975 F.2d at 336.

"*Supplemental assistance* under the provisions of this chapter may be denied or discontinued to any disabled person who refuses medical, surgical, or other treatment, when his disability may be partially or *wholly improved* by such treatment and the extent of his disability would thereby be lessened." I.C. 12–1–7.1–15 (1973) (emphasis supplied).

The changes in this provision are two-fold: first, "assistance" was changed to read "supplemental assistance", in accordance with the redesignation of the cash assistance program to correspond with the new SSI program, and second, the word "restored" was replaced with "improved". This latter change likely reflected the fact that it would be illogical to "restore" a disability for an already-disabled person, and the change further illustrates the legislature's cognizance, at that time, of the possibility of a disabled person's condition being ameliorated with treatment.

In 1988, the bulk of the entire statutory scheme was repealed, including, most notably, the provision relating to refusal of treatment.[25] When a statute contains certain language which is later deleted, statutory construction presumes that the legislature was cognizant of the presence and meaning of the language and intended by its deletion to change the law. *Frey v. Review Bd. of the Indiana Employment Sec. Div.* (1983) Ind. App., 446 N.E.2d 1341, 1344; *Landers v. Pickering* (1981) Ind.App., 427 N.E.2d 716, 718; *Tarver v. Dix* (1981) Ind.App., 421 N.E.2d 693, 698. By deleting the language which, in essence, acknowledged that a person could be disabled under the statutory definition even if restorative treatment was available, the legislature changed the statutory context within which the phrase "reasonably certain to continue throughout the lifetime" existed, thus rendering it susceptible to FSSA's current interpretation.[26] In 1992, the statutory scheme for assistance to dis-

25. The act by which these provisions were repealed, Ind. Acts 4–1988, was entitled, "AN ACT to revise the Indiana Code by repealing obsolete provisions in the Code." "Obsolete" is defined in Webster's as "[n]o longer in use; disused." Webster's Collegiate Dictionary (1977). We note that FSSA produced an affiant who testified that, as far back as 1978, DPW was enforcing the disability statutes consistent with the way they are currently enforced. We simply have no way of knowing under what circumstances or precisely when the statutory definition from 1972 ceased to be enforced according to its terms, but repeal of the refusal provision in 1988 is consistent with nonenforcement occurring prior to that date.

26. With respect to the regulatory scheme, the refusal of treatment provision has already been discussed *supra* at n. 22. In 1984, the entire Medicaid Manual, including the refusal provision, was repealed from the IAC. Also in 1984, 470 IAC 2.1–1–2, which discussed refusal of treatment with respect to all public assistance programs, was added. It contained the following refusal of treatment provision:

"(f)(1) Except as provided in subsection (2) of this section, any recipient ... of public assistance due to disability ... shall be required to cooperate in any treatment plan that is recommended by the examining physician ... if the goal of such treatment is full or partial alleviation of the recipient's disability...."
"Subsection (2)" lists grounds for refusing treatment.

In 1992, responsibility for administering Indiana's Medicaid program was transferred from DPW to the newly created FSSA, and Medicaid regulations were promulgated at 405 IAC (1995 Supp.). 470 IAC 2.1–1–2, however, was retained and repromulgated in 1993. In materials submitted to the court, FSSA calls our attention to its ICES Program Policy Manual. It appears that, with respect to recipients, FSSA considers it to be its obligation to provide Medicaid-covered restorative treatment to those already receiving Medicaid. In the ICES Program Policy Manual § 2412.55.00 (1994), titled "Treatment For Restoration of Physical/Mental Health", the Manual states:
"A disabled recipient is required to cooperate in any treatment plan recommended by the examining physician and approved for payment by Medicaid, which may fully or partially restore his physical or mental health." (citation to 470 IAC 2.1–1–2)
Earlier in the ICES Manual, the familiar disability definition is recited, with citation to the current I.C. 12–14–15–1:
"An individual (to be disabled) must have a physical or mental impairment, disease, or loss ... that appears reasonably certain to continue throughout the lifetime of the individual without significant improvement...." § 2412.25.00
Deposition testimony by an FSSA official indicates that FSSA does not currently have in place a program to monitor compliance on the part of recipients with respect to recommended treatment, though FSSA is seeking to implement such a plan. Record at 407–08.

abled persons was recodified in the form it currently appears, with only the eligibility provision and a provision prohibiting inmates from receiving Medicaid retained in the current chapter.

This brief tracing of the statute's evolution provides the proper context in which to consider the 1995 amendment, which purported to clarify, rather than change, the definition of disability. We first conclude that the amendment holds little, if any, interpretive value for us. If the amendment is an attempt to clarify the language of the 1972 statute, the intent we are searching for is that of the legislature which passed the original statute, not the intent of the legislature which passed the amendment. *Bailey v. Menzie* (1987) Ind.App., 505 N.E.2d 126, 128. "To the extent that the amendment merely represents the opinion of the amending legislature as to how the statute should be construed, it is not controlling. Construction of a doubtful statute is a judicial function, which the courts alone must perform." *Id.* We consider dubious any suggestion that the amendment by the 1995 Indiana legislature sheds instructive light on the intent of its predecessor of more than twenty years.

Further, FSSA has argued that the disability definition is a "medical" one, which is to be made without regard to an applicant's inability to pay for restorative treatment. Frankly, we agree with this assessment; however, the definition of disability in 1972 encompassed, rather than rejected, treatability as an eligibility criterion.

As has been noted, an applicant did not qualify for Medicaid simply by meeting the medical definition; he was also required to lack "sufficient income or other resources to provide a reasonable subsistence compatible with decency and health". I.C. 12-1-7-29(e) (1971). We agree with FSSA that the legislature was aware that people who met Indiana's very strict financial eligibility guidelines would be unable to afford treatment on their own. We conclude from this, however, that the legislature did not see the need to make "special provision" for restorative treatment for those unable to pay, since the vast majority of eligible disabled persons with remediable disabilities would have been unable to pay for the restorative treatment.[27]

## Conclusion

Under FSSA's interpretation of the disability definition for Medicaid purposes, an applicant is not considered "disabled" if his condition can be remedied with treatment, irrespective of whether the applicant can in fact afford to pay for the curative treatment. However, the current eligibility requirement is more restrictive than the eligibility requirement which existed on January 1, 1972, in that the statutory definition of disability in place at that time clearly included, rather than rejected, disabling conditions which were treatable. Because the current interpretation of the disability requirement by FSSA results in more restrictive Medicaid eligibility criteria than those in effect on January 1, 1972, the interpretation is invalid under Section 209(b) of the Social Security Act.

The trial court in this case ordered relief based upon his conclusion that Indiana's Medicaid scheme requires FSSA to take into account an applicant's ability to pay for restorative treatment. Because our conclusion is premised upon a different analysis, and therefore necessitates different relief, we re-

---

27. While we have noted *supra* that no appellate court in this state has been called upon to interpret the definition of disability as it existed in 1972, we are aware of our decision in *Hamilton County Dep't of Pub. Welfare, supra,* 567 N.E.2d 165. In that case, we determined that an applicant for Medicaid benefits is eligible for benefits when the symptoms of a condition, as opposed to the condition itself, are susceptible to improvement. The case could be read to imply that, where the condition itself is susceptible to improvement, an applicant is not eligible for bene- fits. However, that case was decided in 1991, after the 1988 repeal of much of the disability eligibility statute, including the refusal of treatment provision, and nothing in that case suggests that the court was asked to consider or did consider anything other than eligibility criteria as they were at the time of the case. Thus, since we have already noted that the 1988 repeal of much of the disability statute rendered the disability statute susceptible to FSSA's interpretation, our decision here is not contrary to the *Hamilton County* holding.

mand to the trial court with instructions to order relief not inconsistent with this opinion.

FRIEDLANDER and KIRSCH, JJ., concur.